# 14-2611

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



IMANI BROWN,

*Plaintiff-Appellant,*

*v.*

CITY OF NEW YORK, a municipal entity, JUSTIN NAIMOLI, New York City
Police Officer, Shield 26063, in his individual capacity,
THEODORE PLEVRITIS, in his individual capacity,

*Defendants-Appellees,*

*and*

JOHN DOE, in their individual capacities,

*Defendant.*

_____

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF FOR PLAINTIFF-APPELLANT
## WITH SPECIAL APPENDIX

BELDOCK LEVINE & HOFFMAN LLP
Joshua S. Moskovitz
Jonathan C. Moore
*Attorneys for Plaintiff-Appellant*
99 Park Avenue, Suite 1600
New York, New York 10016
212-490-0400

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

PRELIMINARY STATEMENT ....................................................... 1

STATEMENT OF THE CASE
AND JURISDICTIONAL STATEMENT ........................................ 6

ISSUES PRESENTED .................................................................. 6

BACKGROUND ........................................................................... 7

    A.    Facts ................................................................................ 7

    B.    Denial of Plaintiff's discovery request for records of
        complaints against the defendant officers ........................... 16

    C.    Summary judgment ......................................................... 18

SUMMARY OF ARGUMENT ....................................................... 22

ARGUMENT ............................................................................... 23

    I.    THE DISTRICT COURT ERRED IN GRANTING
        DEFENDANTS' SUMMARY JUDGMENT MOTION ................... 23

        A.    The district court's decision acknowledged a
            genuine dispute of material fact and relied on
            improper credibility assessments ................................... 23

            i.    Genuine dispute of material fact .................................... 23

            ii.    Improper credibility assessments .................................. 28

        B.    There are triable issues on Plaintiff's § 1983 claims ............... 31

            i.    Fourth Amendment false arrest claim ............................ 32

            ii.    Fourth Amendment excessive force ............................... 39

        iii.    First Amendment retaliation ............................................43

    C.    Defendants are not entitled to qualified immunity ...................47

II.    THE DISTRICT COURT ERRED IN DENYING
    PLAINTIFF'S REQUEST TO FILE A SUR-REPLY TO
    ADDRESS THE NEW EVIDENCE AND ARGUMENTS
    DEFENDANTS SUBMITTED IN THEIR REPLY PAPERS
    AND WHICH THE COURT RELIED ON IN GRANTING
    DEFENDANTS' MOTION ................................................................48

III.    THE DISTRICT COURT ERRED IN DENYING
    PLAINTIFF'S REQUEST FOR RELEVANT
    DISCOVERY REGARDING COMPLAINTS ABOUT
    THE DEFENDANT OFFICERS ........................................................51

CONCLUSION ........................................................................................................53

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES**          **PAGE**

*Adickes v. SH Kress & Co.*,
     398 U.S. 144, 157 (1970) ............................................................................26

*Anderson v. City of N.Y.*,
     817 F. Supp. 2d 77 (E.D.N.Y. 2011)..................................................43, 45, 47

*Anderson v. Liberty Lobby, Inc.*,
     477 U.S. 242 (1986).................................................................................24, 27

*Bayway Refining Co. v. Oxygenated Marketing & Trading AG*,
     215 F.3d 219(2d Cir. 2000) ............................................................................48

*Berger v. Schmitt*,
     91 F. App'x 189 (2d Cir. 2004) ....................................................................38

*Blue v. Koren*,
     72 F.3d 1075 (2d Cir. 1995) .........................................................................45

*Brinegar v. United States*,
     338 U.S. 160 (1949).......................................................................................34

*Bronx Household of Faith v. Bd. of Educ.*,
     331 F.3d 342 (2d Cir. 2003) ....................................................................51, 53

*Brown v. Texas*,
     443 U.S. 47 (1979).................................................................................11, 37

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
     243 F.3d 93 (2d Cir. 2001) ...........................................................................14

*C.G. v. City of New York*, No. 12-cv-1606,
     2013 U.S. Dist. LEXIS 153020 (E.D.N.Y. Oct. 24, 2013) ..........................38

*City of Houston v. Hill*,
     482 U.S. 451 (1987)...........................................................................20, 43, 44

*Costello v. City of Burlington*,
    632 F.3d 41 (2d Cir. 2011) ....................................................................23, 26

*Crenshaw v. City of Mount Vernon*,
    372 F. App'x 202 (2d Cir. 2010) ...................................................................35

*Curley v. Village of Suffern*,
    268 F.3d 65 (2d Cir. 2001) ....................................................................43, 50

*Eastway Const. Corp. v. City of New York*,
    762 F. 2d 243 (2d Cir. 1985) .........................................................................51

*Fountain v. City N.Y.*, No. 03 Civ. 4526 (RWS),
    2004 US. Dist. LEXIS 7539 (SD.N.Y. May 3, 2004) ...................................52

*Gayle v. Gonyea*,
    313 F.3d 677 (2d Cir. 2002) ....................................................................24, 25

*Gibbs v. City of N.Y.*,
    243 F.R.D. 95 (S.D.N.Y. 2007) ....................................................................52

*Guilbert v. Gardner*,
    480 F.3d 140 (2d Cir. 2007) .........................................................................31

*King v. Conde*,
    121 F.RD. 180 (ED.N.Y. 1988) ....................................................................52

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. 1998) .........................................................................14

*Lederman v. Adams*,
    45 F. Supp. 2d 259 (S.D.N.Y. 1999) ............................................................47

*Lennon v. Miller*,
    66 F.3d 416 (2d Cir. 1995) ....................................................................38, 50

*Maish v. N.Y. City Police Dep't*, No. 92 Civ. 2973 (KTD) (AJP),
    1995 U.S. Dist. LEXIS 4663, at *6-7 (S.D.N.Y. April 11, 1995)................52

*Maryland v. Pringle*,
    540 U.S. 366 (2003).......................................................................................34

*Matter of Davan L.*,
　　91 N.Y.2d at 91 ................................................................... 37-38

*Moore v. Comesanas*,
　　32 F.3d 670 (2d Cir. 1994) .......................................................32

*People v. Baker*,
　　20 N.Y.3d 354 (2013) ...........................................................33, 36

*People v. Carcel*,
　　3 N.Y.2d 327 (1957) ...............................................................35

*People v. Case*,
　　42 N.Y.2d 98 (1977) ............................................................37, 38

*People v. De Bour*,
　　40 N.Y.2d 210 (1976) ..........................................................11, 37

*People v. Howard*,
　　50 N.Y.2d 583 (1980) ............................................................2, 37

*People v. Johnson*,
　　22 N.Y.3d 1162 (2014) ...................................................24, 36, 50

*People v. Lupinacci*,
　　191 A.D.2d 589 (2d Dep't 1993) ..................................................37

*People v. Schanbarger*,
　　24 N.Y.2d 288 (1969) ..........................................................11, 37

*People v. Stevenson*,
　　31 N.Y.2d 108 (1972) ..............................................................41

*Posr v. Court Officer Shield # 207*,
　　180 F.3d 409 (2d Cir. 1999) ...................................................43, 44

*Reeves v. Sanderson Plumbing Prods.*,
　　530 U.S. 133 (2000) ................................................................46

*Reyes v. City of N.Y.*, No. 00 Civ. 2300,
    2000 U.S. Dist. LEXIS 15078,
    2000 WL 1528239, at *2 (S.D.N.Y. Oct. 16, 2000).....................................52

*Ricciuti v. New York City Transit Authority*,
    124 F.3d 123 (2d Cir. 1997) ...................................................................21, 32

*Rivera v. Rochester Genesee Reg. Transp. Auth.*,
    702 F.3d 685 (2d Cir. 2012) .........................................................................31

*Smith v. Goord*,
    222 F.R.D. 238 (N.D.N.Y. 2004) .................................................................53

*Thomas v. Nugent*,
    134 S. Ct. 2289 (2014).................................................................................27

*Thompson v. City of New York*,
    2006 U.S. Dist. LEXIS 4797 (S.D.N.Y. Feb. 7, 2006) ...............................53

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014)...............................................................5, 26, 27, 47

*Tracy v. Freshwater*,
    623 F.3d 90 (2d Cir. 2010) ....................................................................39, 41

*Webster v. City of N.Y.*,
    333 F. Supp. 2d 184 (S.D.N.Y. 2004) ....................................................43, 44

*Weyant v. Okst*,
    101 F.3d 845 (2d Cir. 1996) .............................................................28, 32, 33

*Ybarra v. Illinois*,
    444 U. S. 85 (1979).......................................................................................34

**FEDERAL STATUTES AND RULES**

28 U.S.C. § 1331 ........................................................................................6

28 U.S.C. § 1343 ........................................................................................6

28 U.S.C. § 1291 ........................................................................................6

Fed. R. Civ. P. 56 .....................................................................................23

**STATE STATUTES AND RULES**

N.Y. Crim. Proc. Law § 140.10 ......................................................... 3, 15

N.Y. Penal Law § 10.00 ...........................................................................39

N.Y. Penal Law § 205.30 ..........................................................................14

N.Y. Penal Law § 240.20 ............................................... 15, 24, 34-35, 39, 50

N.Y. Penal Law § 240.26 ..........................................................................33

N.Y. Penal Law § 195.05 ......................................................................33, 38

**SECONDARY**

Letter from Jocelyn Samuels and Preet Bharara to
  Mayor Bill de Blasio *et al.*, dated Aug. 4, 2014, at 19,
  *available at* http://www.justice.gov/usao/nys/pressreleases/
  August14/RikersReportPR/SDNY%20Rikers%20Report.pdf................ 42-43

**PRELIMINARY STATEMENT**

On November 15, 2011, Imani Brown—a Columbia University graduate and at the time an Executive Assistant and Board Liaison at the Judd Foundation—was in lower Manhattan observing the New York City Police Department's overnight eviction of the Occupy Wall Street ("OWS") encampment from Zuccotti Park. In the early morning hours, Ms. Brown and a friend left the park to find a bathroom. A few blocks away, they stopped at a Starbucks and waited outside for the store to open. Responding to a radio dispatch of "six people banging on the doors refusing to leave at Starbucks coffee," Police Officers Justin Naimoli and Theodore Plevritis arrived. They didn't see a group of six people and they didn't see anyone banging on the Starbucks doors; they only saw Ms. Brown, her friend, and another person standing in the general vicinity.

As the officers sat in their car and radioed for further instructions, Ms. Brown approached them and asked if they knew where she could use a bathroom nearby. The officers childishly responded, "what do we look like, the potty police?" Ms. Brown tried again to ask the officers for assistance. This time they rudely told her to "go piss in the park." Ms. Brown finally asked, "so you are just not going to help me, you don't have anything you can offer me, any advice you can offer me?" to which the officers sarcastically told Ms. Brown she "should

1

go home." She explained that she lived over an hour away and preferred to wait for the Starbucks to open.

As she walked away, the officers got out of their car and demanded her ID. She asked them why, and when they did not answer, she declined to provide it, as was her right. Although Ms. Brown had committed no offense and the officers had no probable cause to arrest her, let alone reasonable suspicion to even stop and question her, they grabbed her and told her she was going to jail.[1] Ms. Brown repeatedly asked why she was being arrested and received no answer. Because she was holding her purse in one hand and her phone in the other, she did not offer her hands to the officers. At that, they threw her to the ground, kicked her, pressed her into the sidewalk, and pepper sprayed her twice. Both times Officer Plevritis sprayed her directly in the face in violation of the NYPD's policy against discharging pepper spray closer than three feet in order to avoid a dangerous "hydraulic needle effect."

Under any reasonable view of the evidence, the officers' use of force was improper and unnecessary. They have admitted they knew not to discharge pepper

---

[1] The officers have acknowledged, and their arrest paperwork confirms, that they arrested Ms. Brown because of what she said to them and for refusing to give them her ID. Neither of these facts, however, gave the officers probable cause to arrest her—refusing to provide ID is not a crime, *People v. Howard*, 50 N.Y.2d 583, 590-92 (1980)—and criticizing the officers was protected under the First Amendment. Moreover, the circumstances strongly suggest that the officers decided to confront and arrest Ms. Brown because of her affiliation with OWS.

2

spray so close to a person's face and that there were restraint techniques they could have used that would have allowed them to arrest Ms. Brown without throwing her to the ground or pepper spraying her. For whatever reason—apparently in retaliation for Ms. Brown's protected speech—they chose to use unnecessary, violent, and unsanctioned force in arresting Ms. Brown.

In a transparent effort to justify their unlawful conduct, Officer Naimoli filed a criminal complaint that falsely swore he observed Ms. Brown banging on the Starbucks doors. He has admitted in this case that he saw no such thing.[2] Indeed, Ms. Brown's only conduct the officers were aware of before they arrested her was not the least bit criminal.

After the charges were dismissed, Ms. Brown filed this civil rights suit. Discovery was hampered by the district court's erroneous denial of Ms. Brown's request for the files of relevant complaints against the defendant officers.

---

[2] Trying to explain away this false statement, Officer Naimoli claimed he told the prosecutor who drafted the complaint that he was "informed" Ms. Brown was banging on the Starbucks door, and the prosecutor misheard him. The prosecutor, however, testified at a deposition in this case that he would have paid particular attention to such information because New York law permits an arrest for a non-criminal offense like disorderly conduct only if the officer personally observes the conduct. *See* N.Y. Crim. Proc. Law § 140.10. Officer Naimoli admitted that he understood this provision of New York law and had not personally observed Ms. Brown's alleged disorderly conduct. Thus, it is clear (certainly on a view of the facts in Ms. Brown's favor) that Officer Naimoli lied to ADA Lynch to justify this admitted unlawful arrest and further perjured himself in this litigation to cover up this lie.

3

Nonetheless, Ms. Brown compiled a substantial record supporting her claims, including proof of false statements by the officers. After moving for summary judgment, Defendants submitted new evidence and arguments in their reply papers and the district court refused to allow Ms. Brown to respond. Relying in part on the new grounds raised in the reply, the court granted Defendants' motion.

In its summary judgment decision, the district court admittedly resolved a disputed material fact in favor of the Defendants. The court found that when "Plaintiff approached the officers and asked where she could use a bathroom; the officers did not direct her to a bathroom, and directed plaintiff to leave the area and to 'go home'" (SPA10).[3] But in a footnote attached to that sentence, the court acknowledged that "[t]he parties dispute the specifics of the conversation that occurred between plaintiff and the officers" (SPA10 n.4). The court did not address the context of that conversation from which it is clear the officers never "directed" Ms. Brown to go home; instead, they answered her request for help in locating a bathroom by telling her sarcastically to go home.

This improper finding was critical to the district court's decision, which stated that "[p]robable cause here is based on the uncontested facts regarding the information that the officers knew at the time they arrived at the location and

---

[3] "SPA" refers to pages in the Special Appendix attached as an addendum to this brief. "A" refers to pages in the Joint Appendix.

4

plaintiff's refusal to disperse" (SPA16-17). The district court repeated its erroneous finding throughout the decision—in concluding that Ms. Brown's arrest was lawful (SPA18-20); that her First Amendment claim failed as a result (SPA24); that the officers were entitled to qualified immunity (SPA26); and that the officers' perjury in the criminal case and in this litigation was of no moment because the arrest was lawful (SPA27). These conclusions were all built on the court's resolution of a disputed issue of fact and cannot stand.

The court also made improper credibility assessments. Ms. Brown put forward ample evidence that the officers had lied in her criminal case and in this litigation. She argued that this evidence undermined the officers' credibility and the court could not, therefore, accept their version of events. Yet that is precisely what the district court did in concluding that there was probable cause to arrest Ms. Brown, she resisted arrest, and the officers did not arrest her in retaliation for protected First Amendment activity. Falling victim to a circular argument, the court concluded that the officers' perjury was irrelevant because they had probable cause to arrest Ms. Brown. But that conclusion depends on crediting the officers' version of events and reflects the court's improper credibility assessment.

This case embodies the concerns animating the Supreme Court's rare *per curiam* decision in *Tolan v. Cotton*, 134 S. Ct. 1861 (2014), admonishing the lower courts to strictly adhere to basic summary judgment principles—especially in civil

5

rights cases and when deciding whether to grant qualified immunity. *Tolan* reaffirmed that courts must construe the evidence in the light most favorable to the non-movant, credit evidence that contradicts the movant's position, and resolve disputed issues in the non-moving party's favor. The district court violated each of these fundamental rules.

Following *Tolan*, this Court should vacate the district court's judgment and remand for further proceedings and trial.

## STATEMENT OF THE CASE
## AND JURISDICTIONAL STATEMENT

Plaintiff-Appellant appeals the June 18, 2014 Judgment of the Southern District of New York dismissing this case based on the Opinion and Order of Judge Katherine B. Forrest granting Defendants-Appellees' motion for summary judgment entered the same day (SPA29). Plaintiff filed a timely Notice of Appeal on July 11, 2014 (SPA30). This appeal encompasses the district court's November 22, 2013 Order denying Plaintiff's discovery request and the court's May 12, 2014 Order denying Plaintiff's application to file a sur-reply in opposition to Defendants' motion for summary judgment.

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 and this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

**I.** Whether the district court erred in granting summary judgment where it acknowledged that a critical factual dispute existed, which it resolved in favor of the Defendants, it made credibility assessments, and there were triable issues on Plaintiff's First Amendment retaliation claim and Fourth Amendment false arrest and excessive force claims?

**II.** Whether the district court abused its discretion in denying Plaintiff's request to submit a sur-reply on summary judgment to address new evidence and legal authorities submitted for the first time in Defendants' reply papers, which the court relied upon in granting Defendants' summary judgment motion?

**III.** Whether the district court erred in denying Plaintiff's discovery request for the files of complaints against the defendant officers involving allegations similar to those in this case or involving questions about the officers' credibility, where the court ignored long-standing circuit precedent that such files are discoverable in police misconduct cases like this?

## BACKGROUND

### A. Facts

In the early morning of November 15, 2011, Imani Brown was standing outside of a Starbucks in lower Manhattan waiting for the store to open so that she could use the bathroom (A104, 106-07, 223-24, 635-36). She had spent the

preceding several hours observing and peacefully protesting the eviction of Occupy Wall Street ("OWS") protestors from Zuccotti Park by the New York City Police Department ("NYPD") (A223, 767). As a result of the NYPD's operations in the Park that night, the streets of lower Manhattan were filled with evicted OWS protestors and OWS supporters like Ms. Brown (A767, 805-06).

Around 5:00 a.m., Ms. Brown and a friend had left the vicinity of Zuccotti Park to find a bathroom (A104, 106, 223-24, 635-36). A couple of blocks away they came across a Starbucks store; Ms. Brown knocked on the door and an employee told her the store would be opening at 5:30 a.m., so she decided to wait. (A105-07, 223-29). Another person arrived who also needed to use the bathroom and waited outside (A226, 228-29).

That evening, NYPD Officers Naimoli and Plevritis were working their usual midnight shift—11:15 p.m. to 7:50 a.m.—in the First Precinct where Zuccotti Park is located (A761, 764, 826, 893-895). Sergeant Joseph Taylor, a squad sergeant in the First Precinct, spoke at roll call at the beginning of the shift; Officers Naimoli and Plevritis were present for this debriefing (A762-763, 827, 868, 874-76, 897-99). Sgt. Taylor told the officers about the NYPD's planned operation to clear Zuccotti Park that night and instructed them to avoid the Park

8

because the NYPD's "OWS detail" was handling it (A876-77).[4]  Disregarding

Sgt. Taylor's command, Officers Naimoli and Plevritis went to Zuccotti Park early

in their shift and joined in policing the eviction (A769, 831-34, 893-95).  While

there, Officer Plevritis decided to arrest a person just outside the park (A834-36).

     After processing that arrest, the officers received a radio dispatch shortly

after 5:00 a.m. of "six people banging on the doors refusing to leave at Starbucks

coffee" at 233 Broadway (A683, 789; Moskovitz Decl. Ex. 17 at 05:25-05:44).[5]

The radio transmission did not describe any of these people.  It did not provide a

gender, height, or weight description; did not give anyone's name; and did not

---

[4] Officer Plevritis testified incredibly that he did not know about the NYPD operation in Zuccotti Park (A829).  He claimed that there had been no briefing about it (A829), but Officer Naimoli testified that they were both at Sgt. Taylor's briefing (A762-763, 876-77).

[5] The parties submitted two audio recordings in the district court: one of the 911 call and the other of the corresponding radio dispatch.  Identical copies of these were submitted as Defendants' Exhibits J and K to Andrew Lucas' February 13, 2014 declaration (A71-73), and as Plaintiff's Exhibits 16 and 17 to Joshua S. Moskovitz's April 18, 2014 declaration (A719-21).  These exhibits will be submitted to this Court on separately labeled DVDs (as "Exhibit ___ to Lucas Declaration" and "Exhibit ___ to Moskovitz Declaration").  For ease of reference, the recording of the 911 call is cited herein as "Moskovitz Decl. Ex. 16" and the recording of the radio dispatch is cited as "Moskovitz Decl. Ex. 17."  References to specific time markers within those recordings are included in the citations.

     The parties also submitted several video files in the district court, which will be submitted to this Court on separately labeled DVDs.  Defendants' Exhibit M to the Mr. Lucas' declaration is the same video file as Plaintiff's Exhibit 18 to Mr. Moskovitz's declaration.  Again, for ease of reference, this video file will be cited herein as "Moskovitz Decl. Ex. 18" and the other relevant video files will be cited as "Moskovitz Decl. Ex. 19" and "Moskovitz Decl. Ex. 20."  Citations to these video will also include specific time markers.

9

indicate in any way that Ms. Brown was one of the people in the group (A683, 787-89, 840-41; Moskovitz Decl. Ex. 17 at 05:25-05:44).

When the officers arrived, three people were standing in the vicinity of the Starbucks, but not in front of it (A733, 790; Moskovitz Decl. Ex. 18 at 00:00-00:05).  They were doing nothing more than standing on the sidewalk (A792-793).  The officers did not see anyone banging or kicking on the Starbucks door, they did not see Ms. Brown banging or kicking on the Starbucks door, and they did not see Ms. Brown yelling at anybody; she was simply standing there (A780-781, 786, 842-43, 856).  Observing no criminal activity, the officers sat in their patrol car and radioed to the dispatcher to call back the 911 caller (A791, 901; Moskovitz Decl. Ex. 17 at 11:03-11:22).

Meanwhile, Ms. Brown approached the officers' car and asked them if they could direct her to a nearby bathroom (A109-110, 398, 734-35 739).  The officers responded childishly, "what do we look like, the potty police?" (A735).  Ms. Brown replied "no, of course not, but I figured that you would know the area better than I did and wondered if you could help" (A735).  The officers told her to "go piss in the park" (A735).  Perplexed, Ms. Brown asked "isn't that illegal, won't you arrest me for doing that?" and the officers said they would (A736).  Finally, Ms. Brown asked "so you are just not going to help me, you don't have anything you can offer me, any advice you can offer me?" (A736).  The officers said that

10

she "should go home" (A736). Ms. Brown explained that she lived over an hour away and the Starbucks was opening soon so she would wait (A736).

She began to walk away and the officers left their car (A113, 736-37). As they approached, Ms. Brown asked them why they were getting out of their car; they said they had received a call from Starbucks and asked her for her ID (A113-14, 738-39). Ms. Brown responded with confusion and fear and asked several times "on what grounds?" (A741-43). The officers never answered her question, and so Ms. Brown—as was her right—declined to provide her ID (A736-43).[6]

Abruptly, the officers grabbed her and told her "we were going to give you a citation, but now you are going to jail" (A741-42). Officer Plevritis admitted that he grabbed Ms. Brown *before* he told her that he had asked for her ID to issue her a summons (A413). Ms. Brown repeatedly asked why she was being arrested, but the officers never answered (A741-43; Moskovitz Decl. Ex. 18 at 00:00-00:17).

Having been given no explanation why she was being placed under arrest, and because she was carrying a purse and a cell phone, Ms. Brown did not voluntarily place her hands behind her back (A117, 238-39, 743; Moskovitz Decl. Ex. 18 at 00:00-00:17). At that point—without any lawful justification

---

[6] Ms. Brown was well within her right to refuse to provide the officers with identification. *See, e.g.*, *Brown v. Texas*, 443 U.S. 47 (1979); *People v. Howard*, 50 N.Y.2d 583, 590-92 (1980); *People v. De Bour*, 40 N.Y.2d 210, 223 (1976); *People v. Schanbarger*, 24 N.Y.2d 288, 292 (1969).

whatsoever—the officers grabbed each of Ms. Brown's arms, placed one of Ms. Brown's hands in handcuffs, kicked Ms. Brown's legs out from under her, and violently threw her to the ground (A240; Moskovitz Decl. Ex. 18 at 00:00-01:03). This sudden violent aggression only heightened Ms. Brown's state of fear and shock at how she was being treated, and it caused her purse to fall and the contents to scatter (A241).

While Ms. Brown was frantically reaching for her phone and wallet, the officers got on top of her, grabbed at her, pressed her body and face into the pavement, and kneed her in the back or side (A241, 746, 800-801; Moskovitz Decl. Ex. 18 at 00:18-01:03). Officer Plevritis sprayed her twice in the face with pepper spray, both times discharging the spray inches from her face while Officer Naimoli held her (A714, 744, 859; Moskovitz Decl. Ex. 18 at 01:40-01:50, 02:10-02:15).[7] Officer Naimoli admitted that "the officers kicked [Ms. Brown's] legs out from under her, causing her to fall to the ground on her knees, pressed her face into the ground, and sprayed her in the eyes at least twice with pepper spray while they restrained her" (A800-01).[8]

_____

[7] It is a violation of the NYPD written policy to discharge pepper spray within three feet of a person's face; the NYPD's training policy states that pepper spray should not be discharged from closer than three feet in order to avoid a dangerous "hydraulic needle effect." (A714-15, 913-16, 918-20).

[8] The officers were trained in several other restraint techniques—such as the arm bar, wrist lock, and pressure points techniques—all of which Officer Naimoli

The officers continued to mistreat Ms. Brown even after she was handcuffed. She pleaded with the officers, while kneeling on the ground with her hands cuffed behind her, to pull down her skirt, which had come up during the fracas, so that her lower body would not be exposed when they lifted her up (A745, Moskovitz Decl. Ex. 18 at 03:30-03:45). By then, people had gathered and several were taking pictures and videos (Moskovitz Decl. Ex. 18 at 02:00-03:30). The officers refused her plea and yanked her to her feet exposing her lower body to the gathered crowd and cameras (A745, Moskovitz Decl. Ex. 18 at 03:30-03:45). They brought Ms. Brown to their patrol car and pushed her into the car face first (Moskovitz Decl. Ex. 18 at 03:57-04:00). Several minutes later the officers returned and ordered her to step out of the car; she told them that she could not see (because of the pepper spray), to which Officer Plevritis responded "good" (Moskovitz Decl. Ex. 19 at 00:01-00:05). The officers then drove her to the First Precinct (A69, 683-84, 688-90).

At the precinct, the officers completed paperwork related to Ms. Brown's arrest. The only conduct that they indicated—or have alleged in this lawsuit—as the basis for Ms. Brown's arrest was that she did not leave the area, refused to give

---

acknowledged could be used to restrain a person without taking him or her to the ground (A800-801). The officers were also much larger than Ms. Brown (A724, 802, 836), and had successfully restrained the man they arrested earlier in the evening at Zuccotti Park, who was larger than Ms. Brown and had resisted arrest, without throwing him to the ground or pepper spraying him (A836-38).

her ID, and allegedly used profanity when speaking to the officers (A779-81, 784-86, 788, 795-96, 857, 895, 903). The arrest report claimed that Ms. Brown "was asked to leave . . . after causing a disturbance in front of a store," she "refuse[d] this order," and "refuse[d] to give ID and responded with profanity" (A903).[9] It indicated, as the sole basis for Ms. Brown's arrest, "refusing to move on" under the disorderly conduct provision of subsection (6) of Penal Law § 240.20 (A903).[10]

Yet, both officers admitted in their depositions in this case that they did not observe Ms. Brown "caus[e] a disturbance in front of a store" or do anything other than stand on the sidewalk when they first arrived (A780-781, 786, 790, 792-93,

---

[9] Officer Naimoli, the arresting officer in this incident, prepared a "scratch" complaint report, which the NYPD utilizes for handwritten notes about a complaint that leads to an arrest (A719, 770). Although scratch reports are kept in the ordinary course of business, and scratch complaint reports for First Precinct arrests are customarily kept in the files at the precinct, Defendants could not locate Officer Naimoli's scratch report (A719-720, 931). Ms. Brown brought this spoliation to the attention of the district court and explained that "[t]he spoliation of evidence germane 'to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction.'" Pl.'s Mem. of Law in Opp. to Summ. J. 7 n.4 (ECF Doc. 49) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). "'[A]n inference of spoliation, in combination with "some (not insubstantial) evidence" for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment.'" *Id.* (quoting *Kronisch*, 150 F.3d at 128). However, the district court never ordered a sanction nor construed this spoliation against the Defendants in deciding their summary judgment motion.

[10] It also included a charge for resisting arrest, but that charge cannot itself form the basis for an otherwise unlawful arrest. *See* N.Y. Penal Law § 205.30 (requiring the arrest to be "an authorized arrest").

14

842-43, 856). They also admitted that they had received no more description from the radio dispatch than "six people banging on the doors refusing to leave at Starbucks coffee" (A787-89, 840-41). The officers acknowledged that because they did not personally observe Ms. Brown commit disorderly conduct, which is a violation, not a crime, *see* N.Y. Penal Law § 240.20, they could not arrest her for that offense, *see* N.Y. Crim. Proc. Law § 140.10 (permitting arrest for violations only based on personal observations of the officer) (A778-79, 786-87, 870-71).

Later in the evening, Officer Naimoli spoke with New York County Assistant District Attorney ("ADA") James Lynch, who was screening cases that night (A783-86, 888, 910-11). ADA Lynch prepared a criminal complaint based on what Officer Naimoli told him, which was different than the arrest paperwork. The complaint did not charge Ms. Brown with violating subsection (6) of Penal Law § 240.20 and made no mention of Ms. Brown refusing to leave or refusing to provide her identification (A907-08). Instead, it charged her with violating subsections (1) and (3) of Penal Law § 240.20 for allegedly "engag[ing] in fighting and in violent, tumultuous and threatening behavior" and "us[ing] abusive and obscene language . . . in a public place" "with intent to cause to cause public inconvenience, annoyance and alarm and recklessly causing a risk thereof" (A907-08).

15

The complaint, signed under oath by Officer Naimoli, falsely alleged that he personally observed Ms. Brown "banging on the door of Starbucks and screaming" and that her conduct "caused a crowd to gather and people to express alarm" (A907-08). None of that is true. Officer Naimoli admitted in his deposition that he did not personally observe Ms. Brown banging on the door of Starbucks and that he did not see her yelling at a Starbucks employee (A780-81, 786, 804). The charges were ultimately dismissed on an "ACD" (A257).

Ms. Brown filed her Complaint alleging § 1983 claims under the Fourth Amendment for false arrest and excessive force and First Amendment for retaliation, as well as state law claims, in the Southern District of New York on February 13, 2013, and her Amended Complaint on July 9, 2013 (A3-4). She attempted to resolve the matter through mediation but was unsuccessful (*see* A4). Defendants filed their answer and the parties proceeded to discovery.

### B. Denial of Plaintiff's discovery request for records of complaints against the defendant officers

On November 19, 2013, Ms. Brown submitted a discovery dispute to the district court regarding files related to complaints against the defendant officers (A35-38). She had requested "underlying investigatory files related to complaints against the officers involving allegations similar to the claims in this case and allegations going to the officers' credibility" (A36; *see also* A41). This request encompassed complaints made before and after the events in this case (A41).

16

Ms. Brown made this request based on the Defendants' production of a history of complaints against the officers, pursuant to the Southern District of New York's Plan for Certain Section 1983 Cases, which indicated that complaints had been filed against both officers for excessive force (A36). Defendants refused to produce the requested files (A41, 46).

Citing well-established case law in this circuit, Ms. Brown explained that "there [wa]s no legitimate basis for Defendants to withhold these records" (A36). She also explained that although "Defendants' discovery response reference[d] the deliberative process [and] law enforcement privilege[s]," defense counsel later acknowledged that no documents were being withheld as privileged (A36) (quotation marks omitted). Nonetheless, Ms. Brown provided legal authorities that foreclosed either privilege from shielding the files at issue (A36).

Defendants submitted a perfunctory response. Citing inapposite case law, Defendants claimed that the request was "irrelevant, overbroad, and unduly burdensome" (A52-53). They also asserted that the files "may be subject to law enforcement privilege" (A52), despite their earlier waiver of privilege. Defendants did not submit any affidavits to support a privilege or to buttress their claim that it was too burdensome for the City of New York to produce these files.

On this threadbare record, Judge Forrest denied Ms. Brown's request, concluding that "unsubstantiated complaints are irrelevant to the proof of

17

plaintiff's claim" (SPA3; *see also* A6) (emphasis in original). Judge Forrest also denied Ms. Brown's request for the City's policies and training regarding the use of pepper spray because, according to the court, "[t]hey are also irrelevant to proof of plaintiff's claim" (SPA3; *see also* A6). The court later reconsidered and ordered production of the guidelines and training regarding the use of pepper spray (A6).

### C.    Summary judgment

Defendants filed their motion for summary judgment on all claims on February 13, 2014 (A7). After Ms. Brown submitted her opposition, Defendants filed reply papers that included new legal authorities and evidence (A933-52). Ms. Brown requested she be allowed to submit "a short sur-reply of no more than five pages, which Plaintiff has prepared and is ready to submit," in order to respond to these new points (SPA4). Without explanation, the court denied her request (SPA6).

On June 18, 2014, the district court entered its Opinion and Order granting Defendants' motion in its entirety (SPA7-28). Relying on a view of the evidence that favored the Defendants—and resolving a critical factual dispute for the Defendants—Judge Forrest dismissed Ms. Brown's federal claims (SPA28).[11]

---

[11] The district court did not analyze Ms. Brown's state law claims, but declined to exercise supplemental jurisdiction over them (SPA26-27). Should this Court reverse and remand for the reasons explained herein, Ms. Brown should *ipso facto* be permitted to pursue her state law claims.

The district judge found there was probable cause for arrest based on the judge's own resolution of a disputed fact of whether the officers had issued Ms. Brown a lawful order to disperse (SPA16-17). Judge Forrest did not discuss the context or the language of the conversation in which she found the officers "directed plaintiff to leave the area" (SPA10), and acknowledged that "[t]he parties dispute the specifics of the conversation" (SPA10 n.4).

Again adopting a view of the evidence that favored the Defendants, the district judge concluded that the officers had not used excessive force (SPA21-23). Judge Forrest did not address that the officers, even according to their version of events, were attempting to arrest Ms. Brown without lawful basis and for something that was not a crime under New York law. Nor did the district judge address the evidence showing that the officers chose to use unnecessary and unsanctioned force in arresting Ms. Brown, although they were trained in less violent means of restraint, which they demonstrated the ability to use in arresting a man larger than Ms. Brown earlier that night.

The judge acknowledged that the video evidence confirmed that Officer Plevritis had discharged pepper spray "from within three feet of [Ms. Brown's] face on both occasions" (SPA12 n.6), and recognized that this violated NYPD policy (SPA12 n.6). But the court's opinion mentioned none of these facts in

concluding that the officers' use of force was "reasonable under the circumstances" (SPA23).

With regard to Ms. Brown's First Amendment claim, Judge Forrest took the view that it was foreclosed by a lawful arrest (based on the disputed fact that the officers ordered Ms. Brown to disperse) (SPA23-25). Judge Forrest also decided that it was "mere argument and speculation" that the officers arrested Ms. Brown in retaliation for protected conduct (SPA25). Even where the court's opinion acknowledged that "[i]t is true that 'the First Amendment protects against a significant amount of verbal criticism and challenge directed at police officers'" (SPA24) (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987)), the judge ignored the evidence that the officers arrested Ms. Brown for criticizing their rude and unlawful treatment of her.[12]

The district court concluded that "[q]ualified immunity insulates defendants from liability on [Ms. Brown's] First and Fourth Amendment claims" (SPA26). Specifically, the district judge found that "even if probable cause did not actually

---

[12] Judge Forrest also did not mention the ample evidence Ms. Brown introduced showing that the officers arrested her because of her affiliation with OWS. In particular, Judge Forrest failed to mention the evidence that the officers had disregarded their sergeant's order to stay away from Zuccotti Park, went there anyway, and arrested a person leaving the Park. The judge also left out the officers' dissembling testimony that they did not know that the unusual number of people in the streets of lower Manhattan the night and morning following the Zuccotti Park eviction were affiliated with OWS.

exist," "the officers directed plaintiff to leave the area and go home, but plaintiff decided not to leave the area, and told the officers that she could not go home," and "[t]hus, it was objectively reasonable for the officer[s] to believe that probable cause existed to arrest [Ms. Brown]" (SPA26) (quotation marks omitted) (alteration in original).

Finally, Judge Forrest addressed the evidence that the defendant officers had committed perjury in Ms. Brown's criminal case and in this litigation (SPA27-28). Part of Ms. Brown's summary judgment opposition was that this perjury substantially undermined the officers' credibility and worse, showed that they were covering up for their unlawful conduct. Quoting *Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 125 (2d Cir. 1997) ("Lying is wrong, and if the police lie while acting in their official capacity, they also violate the public trust. Courts must ensure that such serious accusations receive appropriate scrutiny lest our Court appears to endorse such official misconduct, which would weaken the public's respect for the administration of justice."), Ms. Brown explained that it would be improper for the court to accept the officers' testimony for the purposes of summary judgment.

Yet Judge Forrest took a contrary view. She concluded that "[e]ven if true, [Ms. Brown]'s assertions about the officers' alleged perjury"—which is hard to understand given that Officer Naimoli admitted in his deposition that a critical

statement in the criminal court complaint he signed under penalty of perjury was not true (A780-81, 785-86)—"are irrelevant to the outcome of this motion" (SPA27). The district judge decided that since "the officers had probable cause to arrest [Ms. Brown] for disorderly conduct . . . given [Ms. Brown's] refusal to leave the Starbucks" (SPA27), the officers' perjury was meaningless.

The court entered a final judgment dismissing the case on June 18, 2014 (SPA29) and Ms. Brown filed a timely notice of appeal on July 11, 2014 (SPA30).

## SUMMARY OF ARGUMENT

**I.** Summary judgment was improper where the district court acknowledged there was a genuine dispute of material fact, which it resolved in the Defendants' favor, and made improper credibility assessments; the court genuine triable issues for each of Ms. Brown's claims by misconstruing other evidence in favor of the Defendants and ignoring evidence that was harmful to them; and the grant of qualified immunity was based on the same disputed fact improperly resolved by the court.

**II.** Where the district court denied Plaintiff's request to file a short sur-reply to respond to new evidence and legal authorities submitted in Defendants' reply papers on summary judgment, and then relied on these new points in granting Defendants' motion, the court abused its discretion.

**III.** Plaintiff's request for discovery of files related to relevant complaints against the defendant officers was appropriate and supported by long-standing circuit precedent in police misconduct suits. The district court abused its discretion in denying this request where there was no relevant privilege or other reason for not disclosing the files.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN GRANTING DEFENDANTS' SUMMARY JUDGMENT MOTION

This Court "review[s] *de novo* the district court's grant of summary judgment." *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011) (citation omitted). Summary judgment is proper only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. The district court's decision acknowledged a genuine dispute of material fact and relied on improper credibility assessments

### i. Genuine dispute of material fact

The district court found that when "Plaintiff approached the officers and asked where she could use a bathroom; the officers did not direct her to a bathroom, and directed plaintiff to leave the area and to 'go home'" (SPA10). Whether the officers "directed plaintiff to leave the area" is both a material and

23

genuinely disputed fact, which the district court improperly resolved for the Defendants.

Whether the defendant officers directed Ms. Brown to go home was material.[13] "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The district court summarized its conclusion that "[p]robable cause here is based on the uncontested facts regarding the information that the officers knew at the time that they arrived at the location *and plaintiff's refusal to disperse*" (SPA16-17) (emphasis added). Thus, this fact was one of two pillars in the court's conclusion, wrong as it was, that there was probable cause to arrest Ms. Brown.

The court's more finely-tuned analysis that the officers had probable cause to arrest Ms. Brown for disorderly conduct and obstruction of governmental administration also hinged on its finding that the officers directed Ms. Brown to

---

[13] To be sure, even if the officers had given such an order, which they did not, it would have been ineffective as without legal authority. *See* N.Y. Penal Law § 240.20(6) ("congregat[ing] with other persons in a public place" constitutes disorderly conduct only where one "refuses to comply with a *lawful order* of the police to disperse" (emphasis added)). Directing a person to move who is doing nothing more than standing on a sidewalk near a store is not a lawful order to disperse. *See People v. Johnson*, 22 N.Y.3d 1162, 1164 (2014). Ms. Brown's only offense was having the temerity to ask the defendant officers if they could direct her to a public restroom. Putting that aside, since the question of whether such an order was issued is admittedly in dispute, it was improper for the court to rely on it in granting summary judgment.

24

leave (SPA18, 20).[14]   The same is true of the court's First Amendment analysis (SPA24), its qualified immunity analysis (SPA26), and its consideration of the officers' perjury (SPA27).   Thus, whether an order to leave was issued "might affect the outcome of the suit under the governing law."  *Gayle*, 313 F.3d at 682.

Turning to whether the fact was genuinely disputed, there is no question and the district court found that it was.   The court acknowledged that "[t]he parties dispute the specifics of the conversation that occurred between plaintiff and the officers" when, as the court incorrectly found, the officers "directed plaintiff to leave the area and to 'go home'" (SPA10 n.4).

The court mistakenly resolved this dispute in the Defendants' favor by taking the officers' words out of context.   According to Ms. Brown's testimony, when she asked the officers where she could find a bathroom, they said to her, "what do we look like, the potty police?" and when she asked them again they told to "go piss in the park" (A735).   After she finally asked them, "so you are just not going to help me, you don't have anything you can offer me, any advice you can

_____

[14] The district court also concluded that the officers had probable cause to arrest Ms. Brown for harassment.   Based only on a radio dispatch of "six people banging on the doors refusing to leave at Starbucks coffee" and the fact that Ms. Brown was standing in the vicinity of the Starbucks when officers arrived (SPA19-20).   This was hardly enough to constitute probable cause to arrest Ms. Brown for harassment.  *See infra* Point I(B)(i).

25

offer me?" the officers said she "should go home" (A736). This hardly amounts to an order to disperse.

It was error for the district court to disregard this context and find that the officers "directed plaintiff to leave the area and to 'go home'" (SPA10). In weighing a motion for summary judgment, the evidence must be "viewed in the light most favorable to the opposing party." *Adickes v. SH Kress & Co.*, 398 U.S. 144, 157 (1970). Stated another way, the court must "draw[] all reasonable inferences in [the non-moving party's] favor." *Costello*, 632 F.3d at 45. As the Supreme Court recently affirmed, summary judgment requires the court to consider the context and meaning of words in the light most favorable to the non-moving party. *Tolan v. Cotton*, 572 U.S. ___, 134 S. Ct. 1861, 1867-68 (2014) (*per curiam*) (vacating summary judgment where the lower court plucked the plaintiff's words out of context and "a jury could reasonably infer that [the plaintiff's] words, in context, did not amount to a statement of intent to inflict harm").

The district court's decision is an example of a phenomenon of lower federal courts departing from proper summary judgment standards. The rising tide of such decisions, in civil rights cases predominantly, led the Supreme Court recently to issue a rare *per curiam* decision unanimously reversing summary judgment on the facts in a § 1983 case. In *Tolan v. Cotton*, the Court explained that the lower courts had "failed to adhere to the axiom that in ruling on a motion for summary

26

judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" 134 S. Ct. at 1863 (quoting *Anderson*, 477 U.S. at 255). The Court concluded its opinion by underscoring this point:

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [the plaintiff]'s competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Id.* at 1868.

This noteworthy decision—a departure from the Court's usual practice, *see id.* (Alito, J., concurring in the judgment)—is a clear signal to the lower federal courts to strictly adhere to fundamental summary judgment principles, especially in § 1983 suits where the parties' testimony and evidence on the circumstances of an arrest are at odds. The Court has made clear that this statement was not an empty gesture. It has enforced that mandate when another lower federal court deviated from strict adherence to fundamental summary judgment principles. *See Thomas v. Nugent*, 134 S. Ct. 2289 (2014) (granting certiorari, vacating, and remanding "in light of *Tolan v. Cotton*").

This Court must follow *Tolan* and correct the district court's error in granting summary judgment here.

27

### ii. Improper credibility assessments

The district court also made improper credibility assessments in granting summary judgment. Judge Forrest's decision relied on the defendant officers' version of events in finding that there was probable cause to arrest Ms. Brown, that she had resisted arrest, and that the officers did not arrest her in retaliation for her protected First Amendment conduct. This was improper. *See Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996) ("in ruling on a motion for summary judgment, the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments").

Ms. Brown introduced substantial evidence of the defendant officers' false statements in the underlying criminal case and false testimony in this litigation. As noted elsewhere, Officer Naimoli alleged in the criminal complaint that he had personally observed Ms. Brown banging on the door of the Starbucks (A907-08), but he admitted in his deposition that this sworn statement was not true (A780-81, 785-86). His motive for making this false statement was clear: he acknowledged that having not personally observed Ms. Brown commit disorderly conduct or harassment, he had no other lawful basis to arrest her (A778-79, 786-87; *see also* A870-71 (Officer Plevritis' testimony to the same effect)).

28

Compounding this knowing false allegation, which vitiates the legality of the arrest, Officer Naimoli perjured himself in this litigation by claiming that he told ADA Lynch that he was "informed" that Ms. Brown was banging on the Starbucks door (A786). ADA Lynch—although he did not specifically recall drafting the complaint in this case—was very clear that he would have paid particular attention to what the arresting officer told him he personally observed (A885-86). He testified at a deposition in this case that if Officer Naimoli had told him that he was "informed" of Ms. Brown's conduct, he would have drafted the complaint differently and would have put the names of civilian witnesses on the DA Data Sheet (889-91). The DA Data Sheet does not mention any civilian witnesses (A911). ADA Lynch also testified that when he prepares a criminal complaint, he tells the officer to "make sure that everything in it attributed to you is true" and "if it is, sign it and send it back," but if there are any corrections they should call him to make those changes (A883-84). Thus, it is clear that Officer Naimoli signed the criminal complaint knowing that it contained his false allegation that he personally observed Ms. Brown banging on the Starbucks door.

Officer Plevritis also gave incredible testimony in this litigation. First, he claimed that he was unaware of the NYPD's large operation to clear Zuccotti Park in the hours before Ms. Brown's arrest, that he had not been briefed on it, and that it was not strange to him to be uninformed of a large police operation being carried

29

out in his precinct (A829-30). This testimony does not hold water. Officer Naimoli, Officer Plevritis' steady partner, testified that he knew about the operation (A767-68); Sgt. Taylor testified that he told the squad at roll call about the operation and instructed them to avoid the Park that night (A876); and Officers Plevritis and Naimoli were both at that roll call (A763, 826-27, 897-98). Spinning such a strange and unbelievable story reflects the lack of Officer Plevritis' veracity and suggests that he was shielding the truth about some more grave fact, such as his intent to arrest people during that shift who were affiliated with or supporting OWS. *See infra* Point I(B)(iii). The fact that the officers disregarded their sergeant's direct order and went to Zuccotti Park that night, where they arrested a man leaving the park, certainly buttresses this conclusion.

Officer Plevritis also testified that he was approximately three feet away when he pepper sprayed Ms. Brown the second time (A860). But the video leaves no doubt that Officer Plevritis was standing immediately in front of Ms. Brown, with his hand directly in her face, when he sprayed her (Moskovitz Decl. 18 at 02:10-02:15). The district court acknowledged that "[i]t appears from the video evidence that the officers pepper-sprayed [Ms. Brown] from within three feet of her face on both occasions" (SPA12 n.6). Officer Plevritis' motive to lie about this was almost certainly due to the fact that he knew his conduct violated NYPD

policy to not discharge pepper spray from closer than three feet (A913, 918; *see also* SPA12 n.6).

Judge Forrest dismissed all of this evidence undermining the officers' credibility as "irrelevant to the outcome of this motion" (SPA27). The district judge decided that since "the officers had probable cause to arrest [Ms. Brown] for disorderly conduct . . . given [Ms. Brown's] refusal to leave the Starbucks" (SPA27). But this analysis suffers from a circularity: To conclude that probable cause existed, the judge had to make an assessment that officers were credible. This was improper. *See Weyant*, 101 F.3d at 854 ("on a motion for summary judgment, the district court is . . . to eschew credibility assessments"). It also overlooks that lying about important issues in the case is evidence that the officers were trying to hide their true motives and/or knew that their conduct was improper. Thus, this Court should vacate the district court's judgment.

**B.    There are triable issues on Plaintiff's § 1983 claims**

Viewing the summary judgment evidence in Ms. Brown's favor, there are genuine issues for trial on her Fourth Amendment and First Amendment claims. "'A genuine issue exists for summary judgment purposes where the evidence . . . is such that a reasonable jury could decide in that party's favor.'" *Rivera v. Rochester Genesee Reg. Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).

31

### i. Fourth Amendment false arrest claim

The district court erred in concluding that there was no view of the evidence that supported Ms. Brown's claim that the officers lacked probable cause to arrest her. "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. In evaluating the existence of probable cause, courts only "consider the facts available to the officers at the time of the arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). When the question of whether an arresting officer had probable cause is "predominantly factual in nature"—as it is in this case—the question "[i]s properly presented to the jury." *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994); *see also Weyant*, 101 F.3d at 852 (summary judgment improper where a factual "dispute [exists] as to the pertinent events and the knowledge of the officers").

The only information the officers had when they arrived at the Starbucks was the radio dispatch that there were "six people banging on the doors refusing to leave." The dispatch did not describe any individual, did not name Ms. Brown, and did not indicate that Ms. Brown was banging on the Starbucks door. When the officers arrived, they did not see anyone banging on the door, and did not see

32

Ms. Brown doing anything illegal.[15]     Based on this information—the only information known to the officers before they arrested Ms. Brown—there was no lawful basis to arrest Ms. Brown.[16]

The district court mistakenly concluded that there was probable cause to arrest Ms. Brown for three offenses: (1) disorderly conduct under Penal Law § 240.20(6), (2) harassment in the second degree under Penal Law § 240.26(3), and (3) obstruction of governmental administration under Penal Law § 195.05 (SPA17-20).  Aside from the fact that this decision was improper because it turned on the disputed fact of whether the officers' directed Ms. Brown to leave, *see supra* Point

---

[15] In fact, there are serious credibility issues about what the officers claim to have seen when they arrived.  Officer Plevritis claimed that he saw five to six people standing in front of the Starbucks yelling (A64).  Officer Naimoli, however, testified that he saw three to five people "off a little bit to the side" of the store "[j]ust standing around there" (A695).

[16] Defendants argued below that the officers spoke with Torres, the Starbucks manager, before they arrested Ms. Brown, and that he told them she banged on the door.  Aside from the fact that knocking on the door of a commercial business to inquire about using the bathroom is not disorderly conduct, *see, e.g.*, *Weyant*, 101 F.3d at 855; *People v. Baker*, 20 N.Y.3d 354, 359-60 (2013) ("a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem"), the evidence does not support Defendants' assertion that the officers first spoke to Torres.  Ms. Brown testified that the officers did not go to the Starbucks before arresting her (A739-40), Torres and the officers testified that they spoke only once (A798-99, 810), and the video evidence shows the officers spoke with Torres *after* Ms. Brown was arrested (Moskovitz Decl. Ex. 20).  The district court acknowledged this disputed fact (SPA19).  This is further evidence that undermines the credibility of the officers and which should have been considered by the district court in deciding the motion for summary judgment.

33

I(A), construed in the light most favorable to Ms. Brown, the evidence shows that the officers lacked probable cause to arrest Ms. Brown for any of these offenses.

As to disorderly conduct and harassment, the district court concluded that it was immaterial that the officers only had a generalized complaint about "six people banging on the doors refusing to leave" which did not identify any specific individual. To conclude that this information gave rise to probable cause to arrest Ms. Brown is to conclude that there was probable cause to arrest any person in the vicinity of the Starbucks for some indefinite period after the 911 call. This is a fundamental misapplication of the Fourth Amendment requirement that an arrest be supported by individualized probable cause. *See, e.g.*, *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) ("'[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt,' and that the belief of guilt must be particularized with respect to the person to be searched or seized." (citation omitted) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949))); *Ybarra v. Illinois*, 444 U. S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person.").

The court's decision, while mentioning the elements of each offense, failed to analyze whether there was in fact objective evidence of each element. For instance, disorderly conduct under Penal Law § 240.20(6) means "congregat[ing]

34

with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse." The evidence was that Ms. Brown was waiting with her friend (A108), which is not "congregating with other people" within the meaning of the statute. *People v. Carcel*, 3 N.Y.2d 327 (1957) ("The term 'congregates with others', as used in the statute, requires at the very least three persons assembling at a given time and place.").

Nor was there a lawful order to disperse. First, the context of the officers' conversation with Ms. Brown makes it plain that the officers did not issue an order to disperse. The officers told Ms. Brown she "should go home" sarcastically in response to her question whether they had any "advice" for her about where she could use a bathroom. Properly construed, this is not an order to disperse. *See supra* Point I(A).

Even assuming *arguendo* this was an order, it was not lawful. The district court concluded that an order to disperse is lawful "'unless the order was purely arbitrary and not calculated in any way to promote the public order'" (SPA18) (quoting *Crenshaw v. City of Mount Vernon*, 372 F. App'x 202, 206 (2d Cir. 2010)). The court assumed the officers ordered Ms. Brown to disperse because of their "prior knowledge that people had been banging on the [Starbucks] doors refusing to leave" (SPA19). But again, this is a mistaken view of the evidence. The officers did not order the three people standing in the vicinity of the Starbucks

35

to disperse in response to the radio dispatch. Instead, they sat in their car, having seen nothing that concerned them enough to get out. They only said Ms. Brown "should go home" after she approached them, asked for assistance, and refused to shrink from their rude responses to her. In this circumstance, the order, if that's what it was, was "not calculated in any way to promote the public order," it was purely for private vindication. One cannot imagine more arbitrary conduct by a police officer.

Finally, the district court failed to analyze a necessary element of disorderly conduct: the public harm element, which was not present here. *See People v. Johnson*, 22 N.Y.3d 1162, 1164 (2014) ("We have made clear that evidence of actual or threatened public harm ('inconvenience, annoyance or alarm') is a necessary element of a valid disorderly conduct charge."). This aspect of New York's disorderly conduct statute has been a hot-button issue in the New York Court of Appeals over the past two years due to a growing misuse of the statute by police to justify arrests of people for merely criticizing an officer's conduct, *see People v. Baker*, 20 N.Y.3d 356 (2013), and to justify ordering people to move from a public sidewalk, *see Johnson*, 22 N.Y.3d at 1164. Both of those problems were inherent in this case. Nothing known to the officers at the time they arrested Ms. Brown suggested that she intended to cause a public inconvenience,

36

annoyance or alarm even if she had congregated with others and refused a lawful order to disperse.

The district court also erred in concluding that "[r]efusing to obey orders to leave the premises can be the basis for an arrest for obstructing governmental administration" ("OGA") (SPA20). Again, the officers did not order Ms. Brown to leave the area, and if they did, they had no lawful basis to do so. Thus, there could be no probable cause to arrest her for OGA because a necessary element of that offense is obstruction of "an official function," which means "authorized conduct." *See, e.g.*, *People v. Lupinacci*, 191 A.D.2d 589, 590 (2d Dep't 1993).[17]

Moreover, OGA is not satisfied by "mere words alone." *People v. Case*, 42 N.Y.2d 98, 102-03 (1977) ("Under the express provisions of the statute, the interference would have to be, in part at least, physical in nature."); *see also Matter*

---

[17] Refusing to answer an officer's questions, absent some other basis to arrest the person, is not a crime. *See Howard*, 50 N.Y.2d at 591-92 ("Nor can the failure to stop or co-operate by identifying oneself or answering questions be the predicate for an arrest absent other circumstances constituting probable cause. This is because the failure to answer 'cannot constitute a criminal act.'" (citations omitted) (quoting *Schanbarger*, 24 N.Y.2d at 292 (citing *Brown v. Texas*, 443 U.S. 47 (1979))); *see also Howard*, 50 N.Y.2d at 591 ("[W]hile the police had the right to make the inquiry, defendant had a constitutional right not to respond. This is so both because the Fifth Amendment . . . and its State counterpart (New York Const, art I, § 6) permitted him to remain silent and because the Fourth Amendment and its State counterpart (art I, § 12) protect him from detention amounting to seizure unless there is probable cause."); *De Bour*, 40 N.Y.2d at 223; *Schanbarger*, 24 N.Y.2d at 291-92 ("While it may be true that there was no reason why the defendant should not have answered the trooper's questions, it equally is true that his failure to answer cannot constitute a criminal act . . . .").

37

*of Davan L.*, 91 N.Y.2d at 91 ("[P]urely verbal interference may not satisfy the 'physical' component under Penal Law § 195.05"). The district court acknowledged this controlling law, but concluded that unpublished and inapposite federal cases trumped the New York Court of Appeals' interpretation of the state's penal code (SPA20 n.5). This was a mistake.

The district court misplaced reliance on three cases: *Berger v. Schmitt*, 91 F. App'x 189 (2d Cir. 2004), *Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995), and *C.G. v. City of New York*, No. 12-cv-1606, 2013 U.S. Dist. LEXIS 153020 (E.D.N.Y. Oct. 24, 2013) (SPA20 & n.5). First of all, these cases do not stand for the proposition that the district court cited them, *viz.*, merely refusing to leave a location constitutes OGA (SPA20 n.5).[18] Second, and more importantly, none of these cases cites the New York Court of Appeal's controlling decision in *People v. Case* that OGA requires *physical* interference. To the extent these cases are

_____

[18] In *Berger*, the plaintiff returned to the scene of an altercation and the "officers could believe that [he] was attempting to interfere with [their] efforts to contain what had only recently been a volatile situation." 91 F. App'x at 191. This goes well beyond merely refusing to leave a location. In *Lennon*, an estranged couple were fighting over possession of a car, an officer told the wife that the husband could take, at which point the wife "locked herself in the car and attempted to start the engine, with the evident intention of driving away." 66 F.3d at 424. The issue in *Lennon* then was not about merely refusing to leave as the district court concluded (SPA20), but physically interfering with an officer's efforts to return property to its owner.

inconsistent with *Case*, they are not controlling, as the district court mistakenly believed (SPA20 n.8).

Thus, the district court erred in concluding there were not genuine triable issues on Ms. Brown's Fourth Amendment false arrest claim.

### ii.    Fourth Amendment excessive force

The district court likewise erred in granting summary judgment on Ms. Brown's Fourth Amendment excessive force claim (SPA21-23). "The Fourth Amendment prohibits . . . excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010).

> [T]he inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake.  In conducting that balancing, we are guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

*Id.* (citations omitted).

The alleged offense that the officers identified as the reason for the arrest was not even a "crime" under New York law.  N.Y. Penal Law § 240.20(6) (defining disorderly conduct as a "violation"); *id.* § 10.00(3), (6) (defining "crime" as distinct from "violation").  Ms. Brown posed no threat to the safety of the officers or others, and was not aggressively resisting or attempting to evade arrest.

In contrast, the force used to arrest her was brutal and violent. Officer Naimoli acknowledged that in arresting Ms. Brown, the officers kicked her legs out from under her, causing her to fall to the ground on her knees, pressed her face into the ground, and sprayed her in the eyes at least twice with pepper spray while they restrained her (A800-01). The video evidence confirms that before kicking Ms. Brown to the ground, Officer Naimoli placed one of her wrists in handcuffs (Moskovitz Decl. Ex. 18 at 00:08-00:10); while she was on the ground Officer Plevritis kicked her (*id.* at 00:51-54) (Ms. Brown says "don't kick me"); the officers pushed her face into the pavement (*id.* at 01:20-01:22); Officer Plevritis sprayed pepper spray directly at her face from a close distance while Officer Naimoli held her (*id.* at 01:40-01:50); when Ms. Brown was kneeling in place on the ground, Officer Plevritis walked in front of her, said, "you're gonna get it again," pushed her face up, and sprayed pepper spray directly into her face again (*id.* at 02:04-02:13); the officers pulled Ms. Brown to her feet while her dress was up, exposing her lower body to the gathered crowd (*id.* at 03:30-03:45); and they pushed Ms. Brown into the police car face first while her hands were cuffed behind her (*id.* at 03:52-04:01). The fact that the officers acted so violently is in line with the assessment of their supervisor, Sgt. Taylor who said they were both "aggressive when it comes to making arrests," an assessment they both concurred in and believed was accurate (A878-79).

40

The district court overlooked all of the following facts establishing that the force used was also excessive insofar as it was unnecessary. Ms. Brown was 5'6" tall and weighed 120 pounds (A724); Officer Plevritis was 5'10" and weighed 215 pounds, and Officer Naimoli was 5'7" and weighed 150 to 160 pounds (A802, 836-37). The officers knew techniques that they could have used, if they had chosen, to restrain Ms. Brown without throwing her to the ground and pepper spraying her twice (A757-60). Indeed, earlier that evening, during the same shift, Officer Plevritis was able to overcome the resistance of a man 5'9" and 160 or 170 pounds and place him under arrest without throwing him to the ground or pepper spraying him (A835-38).

Additionally, deploying pepper spray from such a close distance was excessive and extremely dangerous. *See Tracy*, 623 F.3d at 98 ("[A] reasonable juror could find that the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force."). It also violated the express policy of the NYPD (A913, 918) (instructing officers not to deploy pepper spray from closer than three feet away because of the serious danger of "hydraulic needle effect").

The district court mistakenly found that Ms. Brown was resisting and that her resistance justified any amount of force. There is a clear dispute of fact about whether Ms. Brown was actively resisting. As the district court acknowledged,

41

"witnesses made several statements to th[e] effect" that Ms. Brown was *not* resisting (SPA21). The video shows Ms. Brown attempting, at first, to keep her phone and contents of her purse from scattering on the street, and later, to protect herself from the officers' violent assault. "[T]here can be no cavil with the proposition that a citizen may use reasonable force in self-defense where the force exerted by the police in effecting an arrest is excessive." *People v. Stevenson*, 31 N.Y.2d 108, 112 (1972). Here, the officers violently kicked Ms. Brown to the ground without cause and proceeded to kick her and drive her face into the pavement. A reasonable jury can find that the officers' force was excessive and that Ms. Brown was justified in attempting to protect her face and body from this unjustified assault.

The district court erred in relying on the officers' hearsay statements from the video to establish as a fact that Ms. Brown was actively resisting (SPA21; *see also* SPA11). These out of court statements provide no evidence that Ms. Brown was in fact resisting; they are inadmissible hearsay to prove that fact; and they were clearly said to justify the officers' otherwise unjustified conduct.[19]

---

[19] The Department of Justice recently concluded in its report about the treatment of adolescent male inmates at Rikers Island that it is common for guards to say "stop resisting" while using unjustified force:

> While utilizing force, staff often yell "stop resisting" even though the adolescent has been completely subdued or, in many instances, was never resisting in the first place. This appears intended

42

Ms. Brown's excessive force claim entails genuine triable issues. The district court sidestepped this obvious conclusion by ignoring substantial evidence and improperly construing the evidence it mentioned in favor of the Defendants. The Court should reverse and remand for Ms. Brown to pursue this claim.

### iii.    First Amendment retaliation

The district court committed many of the same errors in throwing out Ms. Brown's First Amendment claim. "To prevail on a First Amendment retaliation claim, plaintiff must prove '(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.'" *Anderson v. City of N.Y.*, 817 F. Supp. 2d 77, 96 (E.D.N.Y. 2011) (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).

It is "well established that 'the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.'" *Webster v. City of N.Y.*, 333 F. Supp. 2d 184, 201 (S.D.N.Y. 2004) (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987)); *see also Posr v. Court Officer Shield # 207*, 180 F.3d 409, 415 (2d Cir. 1999) ("'[P]rovocative' speech directed at police officers is

---

to establish a record that the continued use of force is necessary to control the inmate.

Letter from Jocelyn Samuels and Preet Bharara to Mayor Bill de Blasio *et al.*, dated Aug. 4, 2014, at 19, *available at* http://www.justice.gov/usao/nys/ pressreleases/August14/RikersReportPR/SDNY%20Rikers%20Report.pdf.

'protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'" (quoting *City of Houston*, 482 U.S. 451)).

The district court overlooked or ignored all of the evidence from which a reasonable jury could find that the officers arrested Ms. Brown because she engaged in protected speech by criticizing their actions. The officers themselves said that they arrested Ms. Brown because she used profane language, refused to leave, and refused to give them her identification (A796, 903). Ms. Brown had every reason to criticize the officers' inappropriate remarks to her. Her consternation when they demanded her ID without cause, and her baffled, frightened reaction to their harassing behavior was protected, even if it did include profanity. Even assuming *arguendo* the officers ordered Ms. Brown to leave, there was no lawful authority for that order nor any more authority for them to demand that Ms. Brown produce her ID. *See supra* Point I(B)(i). Because the officers' testimony reveals that they arrested her in retaliation for criticizing their conduct, they are not entitled to summary judgment. *See City of Houston*, 482 U.S. at 461; *see also Posr*, 180 F.3d at 415; *Webster*, 333 F. Supp. 2d at 201.

Second, the district court dismissed as "mere argument and speculation" all of the evidence showing that the officers arrested and assaulted Ms. Brown in

44

retaliation for her affiliation with the OWS movement (SPA24-25). This was error.

There was a close nexus between Ms. Brown's expressive activity and Defendants' retaliatory conduct: She was arrested with excessive force approximately thirteen minutes after leaving Zuccotti Park at a location only blocks from where she had been observing and protesting the NYPD's eviction of OWS demonstrators. A plaintiff may show "improper motive [through] . . . 'expressions by the officials regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.'" *Anderson*, 817 F. Supp. 2d at 96 (quoting *Blue v. Koren*, 72 F.3d 1075, 1082-1083 (2d Cir. 1995)).

Prior to arresting Ms. Brown, the officers disobeyed Sgt. Taylor's instructions, went to Zuccotti Park where the NYPD was evicting protestors from the Park, and without being ordered to, arrested a person affiliated with OWS. A reasonable juror could infer that the officers intended to arrest OWS protesters that morning, which is precisely what they did. Moreover, their insolence toward Ms. Brown in response to her innocent request for direction to a public bathroom reveals that the officers harbored animosity toward the OWS movement. Their decision to arrest Ms. Brown because she asked them where she could find a bathroom, their use of brutal physical force, and their employment of pepper spray

45

all reflects the officers' derision of people, like Ms. Brown, who are affiliated with the OWS movement.

It would have been clear to the officers that Ms. Brown was affiliated with OWS. They encountered her blocks from Zuccotti Park soon after OWS protestors were evicted. Officer Naimoli testified that he could have inferred that the many people on the streets were related to OWS (A805-06). When Ms. Brown asked the officers for the location of a bathroom, one of them told her "to go piss in the park," which the jury can infer meant Zuccotti Park. Officer Naimoli told Ms. Brown that the booking process was taking longer than usual because "[t]here aren't any cops available because they're all out dealing with your friends," which she understood to mean other OWS protesters (A717). Even Torres readily identified the people waiting outside of the Starbucks as affiliated with OWS (A811).[20]

Although the district court did not reach this issue, the evidence shows that the officers' actions chilled Ms. Brown's First Amendment activity. As a direct

---

[20] Officers Naimoli and Plevritis testified incredibly that they had no idea that Ms. Brown was associated with OWS. Given all the evidence to the contrary, a rational juror could infer that they were being dishonest again about their ignorance of Ms. Brown's affiliation with OWS and, accordingly, that they were hiding their true motivation for her arrest. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) ("the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose").

consequence of the fear and distrust caused by her false arrest, Ms. Brown reduced her involvement with OWS, particularly the protest and demonstration aspects of the movement (A717-18). This shows that Ms. Brown has been chilled in exercising her rights. *See Anderson*, 817 F. Supp. 2d at 97 ("A jury could find that plaintiff's arrest and confinement were sufficient to constitute actual chilling of his First Amendment right to speak out against police officers."); *Lederman v. Adams*, 45 F. Supp. 2d 259, 269 (S.D.N.Y. 1999) (denying summary judgment where plaintiff "continued his advocacy activities in general" but "was unable to continue his demonstration and his First Amendment activities were cut short").

### C.  Defendants are not entitled to qualified immunity

The principles explained in *Tolan* dictate that the Defendants are not entitled to qualified immunity on summary judgment. In addition to the relevance of that decision as discussed above, *Tolan* held that in considering a qualified immunity defense basic summary judgment principles still apply:

> [U]nder either prong [of qualified immunity], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . .  Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard.

*Id.* at 1866 (citations, quotation marks, and paragraph break omitted).

Properly applying these principles, the officers are not entitled to qualified immunity.  There is ample evidence contradicting most of the officers' testimony regarding Ms. Brown's arrest and their use of force and motivations in arresting Ms. Brown.  Thus, for the reasons explained above that summary judgment is improper, qualified immunity is improper.

## II. THE DISTRICT COURT ERRED IN DENYING PLAINTIFF'S REQUEST TO FILE A SUR-REPLY TO ADDRESS THE NEW EVIDENCE AND ARGUMENTS DEFENDANTS SUBMITTED IN THEIR REPLY PAPERS AND WHICH THE COURT RELIED ON IN GRANTING DEFENDANTS' MOTION

The Court "review[s] for abuse of discretion the district court's decision to rely upon . . . evidence" submitted with the summary judgment movant's reply papers.  *Bayway Refining Co. v. Oxygenated Marketing & Trading AG*, 215 F.3d 219, 226 (2d Cir. 2000).

Defendants introduced new evidence and presented new authorities and arguments in their reply papers (A933-952; SPA4).  Ms. Brown requested leave to file a short sur-reply to respond to these new points (SPA4).  The district court denied the request without explanation (SPA6), but then relied on Defendants' new points in granting their motion.  This was an abuse of discretion.  *See Bayway*, 215 F.3d at 227 ("[W]here new evidence is presented in a party's reply brief or affidavit in further support of its summary judgment motion, the district court

48

should permit the nonmoving party to respond to the new matters prior to disposition of the motion." (internal quotation marks omitted)).

First, Defendants submitted three pages of Ms. Brown's "Gchats" (A950-52), which the district court gave considerable weight to (SPA11 n.5, SPA21) without permitting Ms. Brown the opportunity to be heard on them. Had she been allowed to submit her sur-reply, Ms. Brown would have explained the serious flaw in Defendants' reliance on these "Gchats." Defendants claimed that Ms. Brown conceded that her conduct warranted all of the force used by the officers because she wrote "i resisted arrest" in one of the chats (A945-46). The district court essentially adopted this conclusion (*see* SPA11 n.5, SPA 21). Yet the context of the conversation more likely suggests that she meant Ms. Brown was accused of resisting arrest, and that is what she would have testified to by way of affidavit had she been given the opportunity to do so. In any event, a stray comment during a casual chat with a friend—not solemn and sworn testimony—cannot disprove that the officers used excessive force and that Ms. Brown was justified in shielding herself from the blows. *See supra* Point I(B)(ii).

Second, Defendants argued for the first time in their reply that the public harm component of Penal Law § 240.20 applied only to subsection (3) of § 240.20 and not to failure to obey a "lawful order to disperse" under subsection (6) (A939). Defendants were wrong on this point as Ms. Brown was prepared to explain. New

49

York's disorderly conduct statute provides a general *mens rea*—"with intent to cause public inconvenience, annoyance or alarm"—which applies to all of the seven subdivisions of the statute. See Penal Law § 240.20. Addressing subsection (6) of § 240.20, *People v. Johnson*, 22 N.Y.3d 1162 (2014), explained "We have made clear that evidence of actual or threatened public harm ('inconvenience, annoyance or alarm') is a necessary element of a valid disorderly conduct charge." *Id.* at 1164.

While the district court correctly quoted the *mens rea* of Penal Law § 240.20 when setting out the law for disorderly conduct (SPA17-18), it failed to apply the law correctly, as perhaps it would have if it had considered Ms. Brown's sur-reply. The court did not mention the *mens rea* when analyzing the existence of probable cause based on the facts here (SPA18-19); *see supra* Point I(B)(i). And there were no facts that supported a reasonable belief that Ms. Brown's interactions with the police gave rise to actual or threatened public inconvenience, annoyance, or alarm.

Third, the Defendants newly cited *Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995) to argue that there was probable cause to arrest Ms. Brown for OGA (A940). The district court relied on *Lennon* but without the benefit of Ms. Brown's explanation as to why this case was inapposite. *See supra* Point I(B)(i).

Finally, Defendants first cited *Curley v. Village of Suffern*, 268 F.3d 65 (2d Cir. 2001), in their reply and the district court adopted the Defendants' argument

that under *Curley*, Ms. Brown had failed to provide the required "[s]pecific proof"

that the officers had an improper motive for arresting her (SPA24; A943). But

what the district court overlooked, and what Ms. Brown was prepared to tell the

court, is that *Curley* squarely supports Ms. Brown's argument that criticism of

police conduct is protected speech. The evidence shows that the officers arrested

Ms. Brown because she criticized them for their rude treatment of her. *See supra*

Point I(B)(iii).

Had the district court correctly allowed Ms. Brown's to submit her sur-reply,

it would have been fully informed of the arguments on both sides. Because the

court relied on matters that it refused to allow Ms. Brown to address, the district

court abused its discretion and should be reversed.

## III. THE DISTRICT COURT ERRED IN DENYING PLAINTIFF'S REQUEST FOR RELEVANT DISCOVERY REGARDING COMPLAINTS ABOUT THE DEFENDANT OFFICERS

This Court reviews a district court's discovery decisions under an abuse of

discretion standard. *See Eastway Const. Corp. v. City of N.Y.*, 762 F. 2d 243, 251

(2d Cir. 1985). The district court's terse denial of Plaintiff's relevant discovery

request adopted the wrong standard and was an abuse of discretion. *See Bronx*

*Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348 (2d Cir. 2003) (abuse of

discretion "occurs when the district court bases its ruling on an incorrect legal

standard").

It has been the law in this circuit for the past twenty-five years that in civil rights suits, plaintiffs alleging police misconduct are entitled to discovery of the files related to prior complaints against the defendant officers. *See King v. Conde*, 121 F.RD. 180, 198 (ED.N.Y. 1988); *see also Gibbs v. City of N.Y.*, 243 F.R.D. 95, 96 (S.D.N.Y. 2007) ("Plaintiffs are presumptively entitled to discovery of documents on prior complaints and police histories of individual defendants because it could yield relevant information."); *Fountain v. City N.Y.*, No. 03 Civ. 4526 (RWS), 2004 US. Dist. LEXIS 7539, at *5 (SD.N.Y. May 3, 2004) ("'Although a CCRB finding that a complaint was 'Unfounded' or 'Unsubstantiated' may be relevant to an accusation's admissibility at trial, plaintiffs should be afforded the opportunity to review the file.'" (quoting *Reyes v. City of N.Y.*, No. 00 Civ. 2300, 2000 U.S. Dist. LEXIS 15078, 2000 WL 1528239, at *2 (S.D.N.Y. Oct. 16, 2000))); *Maish v. N.Y. City Police Dep't*, No. 92 Civ. 2973 (KTD) (AJP), 1995 U.S. Dist. LEXIS 4663, at *6-7 (S.D.N.Y. April 11, 1995) (requiring production of investigatory files related to allegations made before *and after* the incident at issue).

Plaintiff cited this case law in her discovery demand and in her application to the district court (A36, 41). The district court did not address any of this extensive body of law, mistakenly concluding that "unsubstantiated complaints are irrelevant to the proof of <u>plaintiff's</u> claim" (SPA3) (emphasis in original). As the

52

aforementioned authorities make clear, this conclusion is incorrect and therefore, it reflects an abuse of the district court's discretion. *See Bronx Household of Faith*, 331 F.3d at 348.[21]

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be vacated, its March 28, 2013 Opinion and Order granting summary judgment reversed, its November 22, 2013 order denying Plaintiff's request for discovery reversed, and the case remanded for further proceedings and trial.

Dated:   New York, New York
         October 24, 2014

                              Respectfully submitted,

                              /s/ Joshua S. Moskovitz
                              Joshua S. Moskovitz
                              Jonathan C. Moore
                              BELDOCK LEVINE & HOFFMAN LLP
                              *Attorneys for Plaintiff-Appellant*

---

[21] The district court gave no authority for its determination, but to the extent that it relied on Defendants' case, *Thompson v. City of New York*, 2006 U.S. Dist. LEXIS 4797 (S.D.N.Y. Feb. 7, 2006), that case is inapposite. There, the court reviewed *in camera* 2200 pages of documents and determined, on the facts of the case and its own review of the documents, that the prior complaints were irrelevant. 2006 U.S. Dist. LEXIS 4797, at *8. The district court here did not even conduct *in camera* review. *Thompson* has also been criticized and is rarely followed. *See, e.g., Gibbs*, 243 F.R.D. at 96 ("*in camera* review should not be routinely conducted because it places a substantial burden on the Court and 'is no substitute to full disclosure to, and review of the disputed materials by, a litigant's counsel, who is best positioned to know the party's strategy and assess the relevance *vel non* of the information contained within the disputed materials'") (quoting *Smith v. Goord*, 222 F.R.D. 238, 242 (N.D.N.Y. 2004)).

**CERTIFICATE OF COMPLIANCE**
**PURSUANT TO FED. R. APP. P. 32(a)(7)(C)(i)**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **13,653** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a **proportionally spaced typeface** using **Microsoft Office Word 2013** in **Times New Roman 14-point font**.

Dated:  New York, New York
           October 24, 2014

/s/ Joshua S. Moskovitz
Joshua S. Moskovitz

# SPECIAL APPENDIX

**<u>Table of Contents</u>**

<u>**Page**</u>

Order of the Honorable Katherine B. Forrest,
    dated November 22, 2013 .............................................................. SPA1

Order of the Honorable Katherine B. Forrest, dated May 12, 2014 ..... SPA4

Opinion and Order of the Honorable Katherine B. Forrest,
    dated June 18, 2014, Appealed From ............................................. SPA7

Judgment of the United States District Court for the
    Southern District of New York, entered June 18, 2014,
    Appealed From .......................................................................... SPA29

Notice of Appeal, dated July 11, 2014 ............................................... SPA30



THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

MICHAEL A. CARDOZO
*Corporation Counsel*

ANDREW LUCAS
*Assistant Corporation Counsel*
Phone: (212) 356-2373
Fax: (212) 356-3558
alucas@law.nyc.gov

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

November 21, 2013

**VIA ECF and Email**
Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   Imani Brown v. City of New York, Naimoli and Plevritis,
      13 CV 1018 (KBF)

Your Honor:

I am an Assistant Corporation Counsel in the office of Michael A. Cardozo, Corporation Counsel of the City of New York, representing defendants in the above-referenced civil rights matter. Defendants write regarding plaintiff's November 18, 2013 letter seeking an order to compel discovery, or a conference to discuss outstanding discovery, as well as costs and fees. By way of background this case involves the arrest of plaintiff when she pounded on the door of a Starbucks until the employees inside called 911.

Plaintiff's counsel seeks a conference to discuss production of three types of documents: 1) Underlying disciplinary records; 2) Training materials, policies, guidelines, reviews and analyses regarding pepper spray; and 3) Certain documents relating to the processing of plaintiff's arrest. Defendants oppose plaintiff's first two requests and seek such other relief as the Court deems appropriate.

Plaintiff's request for underlying disciplinary records fails as irrelevant, overbroad, and unduly burdensome. Defendants also argue that any disciplinary documents not previously disclosed may be subject to law enforcement privilege. Plaintiff's claim that these documents must be produced is undermined by the fact that "the Second Circuit has upheld the exclusion of evidence of prior civilian complaints against police officers charged with use of excessive force." Thompson v. City of New York, 2006 U.S. Dist. LEXIS 4797 (S.D.N.Y. Feb. 7, 2006) (finding CCRB and IAB complaints are not discoverable); *citing* Berkovich v. Hicks, 922 F.2d 1018, 1022-23 (2d Cir. 1991).

Case 1:13-cv-01018-KBF  Document 20  Filed 11/21/13  Page 2 of 3

In context, plaintiff has been given disciplinary histories for both officers. None of those allegations involve allegations of false statements. Plaintiff is aware that only one arguably similar complaint pre-dates her arrest. Plaintiff has been provided documentation related to that complaint and precinct level investigation and knows that the result was "exonerated." Plaintiff is also aware that no substantiated complaints exist.

It appears then that plaintiff seeks the disclosure of two CCRB files, and two NYPD disciplinary files that post date the underlying arrest by seven months or more and are not substantiated. Generally, the question of discoverability turns on Fed. R. Civ. P. 26(b)(1), allowing discovery of any non-privileged matter related to claims and defenses that is likely to lead to the discovery of admissible evidence. In Thompson, 2006 U.S. Dist. LEXIS 4797, **5-6, The Court observed:

> Citing grounds such as relevance, improper similar act evidence, and prejudice, courts have consistently denied requests to discover CCRB complaints and other similar documents - especially when the complaints are unsubstantiated. See, e.g., Scaley v. Fishkin, 1998 U.S. Dist. LEXIS 20142, **9-10 (E.D.N.Y. 1998) (finding that unsubstantiated civilian complains do not suffice to prove Monell claim); Hava v. City of New York, 1995 U.S. Dist. LEXIS 7020, **1-2 (S.D.N.Y. 1995) (finding that the requested documents concerning CCRB complaints were not discoverable because they occurred in the distant past, because none was substantiated, and because none involved conduct similar to that alleged by the plaintiff); Marcel v. City of New York, 1990 U.S. Dist. LEXIS 4094, *23 (S.D.N.Y. 1990) ("Unsubstantiated CCRB reports do not demonstrate a breach of a municipality's duty to train or supervise its police."). In fact, documents like the CCRB reports do not show "motive, opportunity, intent or the like," but, instead and impermissibly, serve to show that, because the defendant was previously investigated for excessive force, the fact-finder should believe plaintiff over defendant - "that is the very use of this evidence, however, that Rule 404(b) is designed to prevent." Shaw v. City of New York, 1997 U.S. Dist. LEXIS 4901, at **17-18 (S.D.N.Y. 1997).
> Thompson v. City of New York, 2006 U.S. Dist. LEXIS 4797, **5-6 (S.D.N.Y. Feb. 7, 2006)

As discussed further in relation to plaintiff's requests for policies, plaintiff does not bring a Monell claim in this instance. That further attenuates the claimed need for disciplinary discovery. Plaintiff's letter and request do not provide any explanation of what claims and defenses these collateral incidents relate to. Plaintiff also fails to provide any idea of what admissible evidence they are likely to lead to.

The complaint puts at issue events on November 15, 2011. Unrelated allegations from the Summer of 2012 and later have no relevance, are unduly burdensome, overbroad, and are patently not likely to lead to admissible evidence. Plaintiff's request should be denied. To the extent the Court does order any disciplinary documents be provided, defendants request they be provided for *in camera* review, and defendants reserve the right to invoke any applicable privilege at that time.

Plaintiff's request for training materials, policies, guidelines, reviews and analyses regarding pepper spray fails as plaintiff has pled no municipal liability claim and the documents in question have no relevance.  Plaintiff's second amended complaint contains no allegations of municipal liability.  Generally "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." Pembaur v. City of Cincinnati, 475 U.S. 469, 477 (1986); quoting Monell v. Dep't of Social Services, 436 U.S. 658, 691 (1978).

In this case, plaintiff makes allegations against the individual officers, and the City of New York solely under a theory of *respondeat superior*.  Accordingly, at issue in this case is only whether the actions of the individual defendants were privileged, or in violation of the Constitution.  This question will be determined by the this Court in accordance with the case law of the Supreme Court and the Second Circuit, not by internal police department policies.  Accordingly there is no relevance to the requested material making them squarely outside the scope of Fed. R. Civ. P. 26(b)(1).

Plaintiff's last request seeks several items of discovery which defendants have no objection to and will provide on receipt, subject to privilege if applicable.  This includes, the 1st Precinct Command Log, certain memo books, the medical treatment of prisoner report and the personnel files of the defendant officers.[1]  These documents were previously requested, and defendants have followed up to determine the status of those requests.

Accordingly, plaintiff's request for discovery related to policy and discipline should be denied.  Plaintiff's demand for costs and fees must be dismissed, and plaintiff has failed to make an appropriate showing for sanctions regardless.  *See* United States v. Seltzer, 227 F.3d 36, 41-42 (2d Cir. 2000).

Thank you for your consideration.

Respectfully submitted,
/s/
Andrew Lucas
*Assistant Corporation Counsel*

cc:   Beldock Levine and Moore
      Joshua Moskovitz Esq.
      *Attorney for Plaintiff*

*Ordered*

Plaintiff's motion for categories 1 (certain disciplinary Materials) and 2 (policies re use of force and pepper spray are DENIED. The 3rd category is moot based on defendants' representation that it will or has produced such materials. As to category 1: such unsubstantiated complaints are irrelevant

---

[1] Defendants note that the Aided Cards or reports plaintiff seeks are not available as plaintiff was arrested, the corresponding document for individuals placed under arrest is the medical treatment of prisoner report, listed above.  The "Scratch" copies plaintiff discusses will be provided to the extent they exist and are available.

to the proof of plaintiff's claim. As to category 2: They are also irrelevant to proof of plaintiff's claim as the question is not a Monell question, but whether these officers on this specific occasion violated a protected right.

So ordered.   K. B. Forrest
11/22/13    USDJ



BELDOCK LEVINE & HOFFMAN LLP

99 PARK AVENUE

NEW YORK, N.Y 10016-1503

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: MAY 1 2 2014 |

ELLIOT L. HOFFMAN
MYRON BELDOCK
BRUCE E. TRAUNER*
PETER S. MATORIN
KATHERINE G. THOMPSON
CYNTHIA ROLLINGS
JONATHAN MOORE*
KAREN L. DIPPOLD
JONATHAN K. POLLACK
HENRY A. DLUGACZ
STEPHEN J. BLUMERT*

TEL. (212) 490-0400
FAX (212) 557-0565
WEBSITE: blhny.com

LAWRENCE S. LEVINE (1934-2004)

COUNSEL
MARJORY D. FIELDS
JODY L. YETZER

REF

**WRITER'S DIRECT CONTACT:**
(212) 277-5823
jmoskovitz@blhny.com

WRITER'S DIRECT DIAL

ALSO ADMITTED IN
*CALIFORNIA
ΔILLINOIS
• FLORIDA
øNEW JERSEY

May 9, 2014

### VIA ECF AND EMAIL

Honorable Katherine B. Forrest
United States District Court
Southern District of New York
500 Pearl Street, Room 730
New York, NY 10007

Re: *Brown v. City of New York et al.*, No. 13-cv-01018 (KBF)

Dear Judge Forrest:

My firm represents plaintiff Imani Brown in this civil rights case. I write first to seek leave to submit a sur-reply to Defendants' motion for summary judgment so that Plaintiff may respond to the new arguments submitted in Defendants' reply papers; and second, to alert the Court to the Supreme Court's recent decision in *Tolan v. Cotton*, No. 13-551 (May 5, 2014), which supports Plaintiff's opposition to Defendants' motion. A copy of the slip opinion is attached.

Plaintiff requests leave to file a short sur-reply of no more than five pages, which Plaintiff has prepared and is ready to submit. "The standard for granting a leave to file a surreply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001). Defendants' reply includes a new argument misstating New York Penal Law, discusses a number of new cases not previously cited by the parties, and attaches three new pieces of evidence not previously offered. Without the opportunity to submit a sur-reply, Plaintiff would be unable to respond to these new points.

The Supreme Court's decision earlier this week in *Tolan v. Cotton* is highly relevant to Defendants' motion before the Court. In *Tolan*, the plaintiff brought a § 1983 excessive force

BELDOCK LEVINE & HOFFMAN LLP

Hon. Katherine B. Forrest
May 9, 2014
Page 2

claim—one of the same claims Plaintiff has brought here—against a police officer who shot the
plaintiff during a late-night incident on the porch of the plaintiff's parent's home. Slip op. 1-3.
The officer moved for summary judgment on the grounds of qualified immunity, which the
district court granted, concluding that the "use of force was not unreasonable and therefore did
not violate the Fourth Amendment." *Id.* at 4. The Fifth Circuit affirmed, but instead of reaching
the constitutionality of the officer's conduct, "it held that even if [the officer's] conduct did
violate the Fourth Amendment, [he] was entitled to qualified immunity because he did not
violate a clearly established right." *Id.* at 4-5.

The Supreme Court unanimously reversed and explained that the lower courts had "failed
to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the
nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* at 1
(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The Court reaffirmed that
in considering a qualified immunity defense, whether the court addresses prong one of the
defense—that the officer's conduct violated a federal right—or prong two—that the right was
clearly established—basic summary judgment principles still apply:

> Courts have discretion to decide the order in which to engage these two
> prongs. But under either prong, courts may not resolve genuine disputes of fact in
> favor of the party seeking summary judgment. This is not a rule specific to
> qualified immunity; it is simply an application of the more general rule that a
> judge's function at summary judgment is not to weigh the evidence and determine
> the truth of the matter but to determine whether there is a genuine issue for trial.
> Summary judgment is appropriate only if the movant shows that there is no
> genuine issue as to any material fact and the movant is entitled to judgment as a
> matter of law. In making that determination, a court must view the evidence in
> the light most favorable to the opposing party. Our qualified-immunity cases
> illustrate the importance of drawing inferences in favor of the nonmovant, even
> when, as here, a court decides only the clearly-established prong of the standard.
> *Id.* at 6-7 (citations, quotation marks, and paragraph break omitted).

Applying these principles, the Court concluded that "[i]n holding that [the officer's]
actions did not violate clearly established law, the Fifth Circuit failed to view the evidence at
summary judgment in the light most favorable to [the plaintiff] with respect to the central facts of
th[e] case." *Id.* at 8. The Court explained that there was evidence that contradicted the officers'
testimony regarding material facts about the use of force. *Id.* at 8-10. Therefore, summary
judgment was improper. The Court concluded its opinion by underscoring this point:

> The witnesses on both sides come to this case with their own perceptions,
> recollections, and even potential biases. It is in part for that reason that genuine disputes
> are generally resolved by juries in our adversarial system. By weighing the evidence and
> reaching factual inferences contrary to [the plaintiff]'s competent evidence, the court

BELDOCK LEVINE & HOFFMAN LLP

Hon. Katherine B. Forrest
May 9, 2014
Page 3

below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party. *Id.*

This rare *per curiam* reversal by the Supreme Court on the facts of a summary judgment decision is a clear signal to the lower federal courts that they must carefully guard against summary judgment on a § 1983 claim where the plaintiff's testimony and evidence contradicts the defendants' evidence on the circumstances of an arrest. *Tolan* thus reinforces the conclusion that Defendants' summary judgment motion here must be denied because, as Plaintiff has pointed out in her opposition papers, there is substantial evidence that contradicts Defendants' testimony and, taken in the light most favorable to Plaintiff, shows that any reasonable officer would know that there was not probable cause to arrest Plaintiff and the force used to arrest her was unreasonable and excessive.

A key example of a material factual dispute that Defendants ask the Court to resolve in their favor is whether the officers spoke with the Starbucks employee before arresting Plaintiff. Defendants assert that "all the evidence in this case" proves that they spoke before Plaintiff's arrest. *See* Defs.' Reply 56.1 ¶¶ 15-20, 97. Yet, Defendants themselves acknowledge that this fact is disputed, *id.* ¶ 97, as they must since the video evidence proves that they spoke *after* Plaintiff's arrest, *see* Pl.'s 56.1 ¶ 97. Defendants hypothesize that the officers "may have spoken" with the Starbucks employee a second time after Plaintiff's arrest, Defs.' Reply 56.1 ¶ 97, yet Officer Naimoli and the Starbucks manager both testified that they spoke only once, Pl.'s 56.1 ¶ 97. Defendants attempt to overcome this fatal blow to their summary judgment motion by contending that this is not a material fact, but it is firmly established that "[i]n evaluating the existence of probable cause, courts only consider the facts available to the officers at the time of the arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). Thus, as *Tolan* makes clear, summary judgment is improper

We appreciate the Court's attention to this request, and consideration of the significance of the *Tolan* decision in deciding Defendants' motion for summary judgment.

Sincerely,

Joshua S. Moskovitz

cc:     Andrew Lucas (by ECF)

*Ordered*
*Application for leave to file*
*sur-reply denied.*

5/12/14      K. B. Forrest
                  USDJ

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 1 8 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                              :
IMANI BROWN,                                  :
                                              :
                              Plaintiff,      :            13-cv-1018 (KBF)
                                              :
            -v-                               :          OPINION & ORDER
                                              :
CITY OF NEW YORK, et al.,                     :
                                              :
                              Defendants.     :
                                              :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On February 13, 2013, plaintiff initiated this action against defendants the
City of New York and police officers Justin Naimoli and Theodore Plevritis, alleging
several violations of plaintiff's constitutional rights in connection with her arrest in
November 2011. Now before the Court is defendants' motion for summary
judgment. (ECF No. 34.) For the reasons set forth below, defendants' motion is
GRANTED.

I.      BACKGROUND

        A.      Factual Background

The following facts are undisputed unless stated otherwise.

                1.      Events prior to plaintiff's arrest

On November 15, 2011, plaintiff was with friends when one of them received
a text message stating that Occupy Wall Street ("Occupy") was being evicted from
Zuccotti Park. (Defs.' Local Rule 56.1 Stmt. of Undisputed Fact ("Defs.' 56.1") ¶¶ 1,
2, ECF No. 35; Pl.'s Resp. to Defs.' Local Rule 56.1 Stmt. ("Pl.'s 56.1") ¶¶ 1, 2, ECF

No. 52.) Plaintiff went to Zuccotti Park to witness the events and arrived at approximately 2:00 a.m. (Defs.' 56.1 ¶¶ 4–6, Pl.'s 56.1 ¶¶ 4–6.) At approximately 5:00 a.m., plaintiff left the area around Zuccotti Park with a friend, Johnny Sagan, so that plaintiff could find a bathroom. (Defs.' 56.1 ¶ 8, Pl.'s 56.1 ¶ 8.)

Plaintiff saw a light on at a nearby Starbucks. (Defs' 56.1 ¶ 9; Pl.'s 56.1 ¶ 9.) She approached the Starbucks and knocked on the door and, using an elevated voice, gestured to herself and to an employee inside. (Defs.' 56.1 ¶¶ 11, 14; Pl.'s 56.1 ¶¶ 11, 14.) Sagan described plaintiff as "banging on the door asking them to use their discretion and let her go to the bathroom." (Defs.' 56.1 ¶ 71; Pl.'s 56.1 ¶ 71.) A female employee approached the door, opened it, and told plaintiff that the store was closed; she then walked away. (Defs.' 56.1 ¶ 12; Pl.'s 56.1 ¶ 12.) After bringing Starbucks employees to the door twice, plaintiff decided to wait for the store to open. (Defs.' 56.1 ¶¶ 10–16; Pl.'s 56.1 ¶¶ 10–16.) At least one other individual, in addition to plaintiff and Sagan, arrived in front of the Starbucks and waited with plaintiff. (Defs.' 56.1 ¶¶ 17, 18, 48; Pl.'s 56.1 ¶¶ 17, 18, 48.)

At 5:05 a.m., the assistant manager of the Starbucks, Ismael Torres, called 911; he stated that he had "some people knocking on the door really really bad trying to get in the store to use the bathroom—and they like—you know, making nasty comments. And I can't op--open like this." (Defs.' 56.1 ¶¶ 20–22; Pl.'s 56.1

¶¶ 20–22.)[1]  Plaintiff did not see anyone else knocking on the door to the Starbucks. (Defs.' 56.1 ¶ 19; Pl.'s 56.1 ¶ 19.)

The dispatcher relaying the 911 call informed defendants Naimoli and Plevritis ("the officers") that there were "six people banging on the doors refusing to leave at Starbucks Coffee"; the dispatcher did not specifically identify or name plaintiff or another individual. (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶¶ 29, 91, 92; Defs.' Reply Rule 56.1 Stmt. of Undisputed Fact ("Defs.' Reply 56.1") ¶¶ 91, 92.)  The officers arrived at the Starbucks at approximately 5:10. (Defs.' 56.1 ¶¶ 30, 34; Pl.'s 56.1 ¶¶ 30, 34.)  At least three people were standing outside the Starbucks. (Defs.' 56.1 ¶ 35; Pl.'s 56.1 ¶ 35.)[2]  At the time that the officers arrived, they did not see anyone banging on the doors; the parties dispute whether the officers saw plaintiff yelling at the Starbucks employee. (Pl.'s 56.1 ¶¶ 93–95; Defs.' Reply 56.1 ¶¶ 93–95.)

The officers requested that the dispatcher call Torres back for additional information. (Defs.' 56.1 ¶ 31; Pl.'s 56.1 ¶ 31.)[3]  At 5:12, Torres informed the dispatcher that he had just spoken to the police. (Defs.' 56.1 ¶¶ 32, 33; Pl.'s 56.1 ¶¶ 32, 33.)

---

[1] Torres testified that he told the individuals knocking that he was calling 911, and that he was visible while on the phone. (Defs.' 56.1 ¶ 25.) However, plaintiff and Sagan testified that they did not know that a Starbucks employee had called 911. (Pl.'s 56.1 ¶ 25.)

[2] The parties dispute whether the officers knew or believed that the people outside the Starbucks were part of the Occupy movement. (Defs.' 56.1 ¶ 81; Pl.'s 56.1 ¶ 81.) Plevritis testified that he did not believe that the people outside Starbucks were part of Occupy; plaintiff argues that this testimony was not credible for several reasons, and cites Torres's testimony that the people outside the Starbucks did appear to be Occupy protestors. (Pl.'s 56.1 ¶ 81.)

[3] According to defendants, the officers got out of the car and spoke to Torres, who informed them that plaintiff banging on the door had made him fearful and concerned for the store property; the officers then ordered the group to disperse. (Defs.' 56.1 ¶¶ 36–40, 42.) However, plaintiff disputes that either of the officers spoke to Torres before arresting her, and also disputes that the officers ordered the group to disperse before getting back in the car. (Pl.'s 56.1 ¶¶ 36–40, 42.)

3

        2.    Plaintiff's arrest

Plaintiff approached the officers and asked where she could use a bathroom; the officers did not direct her to a bathroom, and directed plaintiff to leave the area and to "go home." (Defs.' 56.1 ¶¶ 45, 46; Pl.'s 56.1 ¶¶ 45, 46; Decl. of Andrew Lucas in Supp. of Defs.' Mot. for Summ. J. ("Lucas Decl.") Ex. B, at 32:12–19, 34:17–20, Ex. F, at 43:8–13, ECF No. 36.)[4] Plaintiff told the officers that she could not go home and refused to leave the area. (Defs.' 56.1 ¶¶ 47, 52; Pl.'s 56.1 ¶¶ 47, 52; Lucas Decl. Ex. F, at 43:17–22.) In a subsequent online chat, plaintiff stated that she "refused to move." (Supp. Decl. of Andrew Lucas ("Lucas Supp. Decl.") Ex. 1, ECF No. 57.)

The officers exited the car, informed plaintiff that Starbucks had called them, and asked for her identification, which she declined to provide. (Defs.' 56.1 ¶¶ 49–51; Pl.'s 56.1 ¶¶ 49–51.) The officers told plaintiff that they were going to place her under arrest and send her to jail. (Defs.' 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.) They then grabbed her arm to place her under arrest. (Defs.' 56.1 ¶ 54; Pl.'s 56.1 ¶ 54.) Plaintiff did not voluntarily place her hands behind her back or otherwise offer her arms to be handcuffed. (Defs.' 56.1 ¶ 55; Pl.'s 56.1 ¶ 55.)

In the process of arresting plaintiff, the officers asked her to stop resisting them at least four times. (Defs.' 56.1 ¶ 56; Pl.'s 56.1 ¶ 56.) Sagan said, "Please don't put her on the floor, just please let her go." (Id.) Plevritis replied, "No, she's under arrest," then said, "Stop moving your arms, stop resisting, miss, stop

---

[4] The parties dispute the specifics of the conversation that occurred between plaintiff and the officers. (Defs.' 56.1 ¶¶ 45, 46; Pl.'s 56.1 ¶¶ 45, 46.)

resisting. Miss, stop resisting. All right, you're going to the ground now." (Id.)[5]
The officers took plaintiff to the ground. (Defs.' 56.1 ¶ 57; Pl.'s 56.1 ¶ 57.) After
being taken to the ground, plaintiff did not offer her arms; she was afraid that the
contents of her purse had been scattered, and she was trying to keep her phone and
wallet from being lost. (Defs.' 56.1 ¶ 62; Pl.'s 56.1 ¶ 62.) After taking plaintiff to
the ground, plaintiff continued to resist; the officers told plaintiff to stop resisting
14 times, to "stop it" five times, and to give over her hands. (Defs.' 56.1 ¶¶ 64–66;
Pl.'s 56.1 ¶¶ 64–66; Lucas Decl. Ex. M.) According to plaintiff, witnesses made
several statements that plaintiff was not resisting. (Pl.'s 56.1 ¶¶ 64, 65, 72.) In the
aforementioned online chat, plaintiff stated that she "resisted arrest." (Supp. Decl.
of Andrew Lucas ("Lucas Supp. Decl.") Ex. 1, ECF No. 57.)

 One of the officers said to plaintiff, "Give us your hands or you're going to get
pepper-sprayed right now." (Defs.' 56.1 ¶ 67; Pl.'s 56.1 ¶ 67.) One of the officers
then pepper-sprayed plaintiff for approximately one second. (Defs.' 56.1 ¶ 69; Pl.'s
56.1 ¶ 69.) Plaintiff continued to resist; the officers told plaintiff multiple times to
stop resisting and to place her hands behind her back. (Defs.' 56.1 ¶ 72; Pl.'s 56.1 ¶

---

[5] Plaintiff argues that the officers' orders to plaintiff to stop resisting are inadmissible to prove that
she was resisting. (Pl.'s 56.1 ¶¶ 60, 62–64.) Plaintiff also argues that her arms were twisted behind
her back such that she could not offer them to be handcuffed (Pl.'s 56.1 ¶ 60.) However, plaintiff
does not dispute that she refused to offer her arms to be handcuffed, and she stated in an online chat
that she resisted arrest. (Pl.'s 56.1 ¶ 55; Lucas Supp. Decl. Ex. 1.) Moreover, the video evidence in
the record makes clear that plaintiff was resisting arrest by trying to keep her hands free and to
avoid the officers' attempts to handcuff her. No reasonable juror could infer otherwise from the
evidence. (See Lucas Decl. Ex. M.) The Court thus concludes that, notwithstanding plaintiff's
assertions, there is no triable issue of fact as to whether she was resisting: she was, and no
reasonable juror could conclude otherwise. See Scott, 550 U.S. at 380 ("When opposing parties tell
two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury
could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion
for summary judgment.").

72; Lucas Decl. Ex. M.)  Plaintiff's skirt had come up, and she attempted to pull her skirt down.  (Defs.' 56.1 ¶ 73; Pl.'s 56.1 ¶ 73.)  Officer Plevritis said to plaintiff, "You're going to get it again, you're going to get it again."  (Defs.' 56.1 ¶ 74; Pl.'s 56.1 ¶ 74.)  Plaintiff testified that she was warned that she would be pepper-sprayed a second time if she did not surrender her hands.  (Defs.' 56.1 ¶ 75; Pl.'s 56.1 ¶ 75; Lucas Decl. Ex. F, at 54:21–24.)  After pepper-spraying plaintiff a second time, the officers told plaintiffs to put her hands behind her back multiple times and to stop resisting.  (Defs.' 56.1 ¶ 77; Pl.'s 56.1 ¶ 77.)[6]

After continuing to resist for approximately 20 seconds, plaintiff offered her arms to be handcuffed and allowed herself to be arrested in order to "regain [her] dignity and move on out of this current situation."  (Defs.' 56.1 ¶ 78; Pl.'s 56.1 ¶ 78; Lucas Decl. Ex. F, at 56:01–10.)  Plaintiff was in physical pain and did not want to be pepper-sprayed again.  (Defs.' 56.1 ¶ 78: Pl.'s 56.1 ¶ 78.)  After plaintiff was handcuffed, while she was kneeling on the ground with the officers holding her, she asked them to please pull her skirt down so before they lifted her up so that her lower body would not be completely exposed; Plevritis said, "No," and the officers pulled plaintiff to her feet.  (Pl.'s 56.1 ¶ 149; Defs.' Reply 56.1 ¶ 149; Lucas Decl. Ex. M.)  The officers then placed plaintiff in the police car and transported her to the First Precinct.  (Defs.' 56.1 ¶ 84; Pl.'s 56.1 ¶¶ 84, 150; Defs.' Reply 56.1 ¶ 150.)[7]

---

[6] It appears from the video evidence that the officers pepper-sprayed plaintiff from within three feet of her face on both occasions.  (Pl.'s 56.1 ¶¶ 152, 153; Defs.' Reply 56.1 ¶¶ 152, 153; Lucas Decl. Ex. M.)  The City of New York Police Department Patrol Guide instructs service members using pepper-spray devices to use "two (2) one second bursts, at a minimum distance of three (3) feet."  (Decl. of Joshua S. Moskovitz ("Moskovitz Decl.") Ex. 14, at D176, ECF No. 54.)

[7] The parties' dispute over the sequence of events that occurred after this point is immaterial to the Court's decision.  (Pl.'s 56.1 ¶¶ 150, 151; Defs.' Reply 56.1 ¶¶ 150, 151.)

3.     Plaintiff's charges

Plaintiff was ultimately arraigned on two charges: resisting arrest under New York Penal Law § 205.30 and disorderly conduct under New York Penal Law § 240.20(1) and (3).  (Defs.' 56.1 ¶ 88; Pl.'s 56.1 ¶ 88; Moskovitz Decl. Ex. 12.)

Plevritis recorded plaintiff's arrest in his memo book as follows: "Female Black refuses to leave location and refuses to give ID[.]  Female then resists arrest by flailing her arms and twisting her body.  Pepper spray used 2x to restrain female."  (Pl.'s 56.1 ¶ 99; Defs.' Reply 56.1 ¶ 99.)  Naimoli prepared an electronic arrest report that stated that plaintiff "was asked to leave location after causing a disturbance in front of a store.  Deft did refuse this order. . . .  While effecting arrest deft did resist by pulling her arms and trying to push away from officers to prevent being handcuffed."  (Pl.'s 56.1 ¶ 102; Defs.' Reply 56.1 ¶ 102.)  The arrest report indicated one disorderly conduct provision as the basis for her arrest: Penal Law § 240.20(6), "refusing to move on."  (Pl.'s 56.1 ¶ 88; Lucas Decl. Ex. N.)

Later in the evening, Assistant District Attorney ("ADA") James Lynch spoke with Naimoli and prepared a criminal complaint based on that conversation.  (Pl.'s 56.1 ¶ 107; Defs.' Reply 56.1 ¶ 107.)  The criminal complaint did not charge plaintiff with violating Penal Law § 240.20(6) and did not mention that plaintiff refused to leave or to provide identification.  (Pl.'s 56.1 ¶ 88; Moskovitz Decl. Ex. 12, at D94.)  Instead, the criminal complaint charged plaintiff with violating Penal Law § 240.20(1) and (3) for having "engaged in fighting and in violent, tumultuous and threatening behavior" and "used abusive and obscene language and made an obscene gesture in a public place" "with intent to cause public inconvenience,

7

annoyance and alarm and recklessly causing a risk thereof." (Id.) The complaint, which Naimoli signed under oath, alleged that Naimoli personally observed plaintiff "banging on the door of Starbucks and screaming" that she needed to use the bathroom, and that her conduct "caused a crowd to gather and people to express alarm." (Pl.'s 56.1 ¶ 103; Defs.' Reply 56.1 ¶ 103; Moskovitz Decl. Ex. 12, at D94.)

Plaintiff accepted an adjournment in contemplation of dismissal at her second court appearance. (Defs.' 56.1 ¶ 89; Pl.'s 56.1 ¶ 89.)

B.    Procedural History

On February 13, 2013, plaintiff filed her initial complaint. (ECF No. 1.) On July 9, 2013, plaintiff filed an amended complaint. (ECF No. 7.) On February 13, 2014, defendants filed the instant motion for summary judgment. (ECF No. 34.) The motion became fully briefed on May 2, 2014. (ECF No. 56.)

Plaintiff's complaint alleges the violation of plaintiff's First Amendment rights through retaliating against her for her expressive conduct (Compl. ¶¶ 47–55); the violation of her Fourth and Fourteenth Amendment rights through, inter alia, false arrest and imprisonment, excessive force, and inhumane conditions of confinement (id. ¶¶ 56–59); and various state-law claims, including violation of the New York State Constitution, assault and battery, intentional infliction of emotional distress, negligence, and negligent infliction of emotional distress (id. ¶¶ 64–84). Plaintiff has conceded her Fourteenth Amendment and conditions-of-confinement claims. (Pl.'s Mem. of L. in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp.") 1 n.1, ECF No. 49; Reply Mem. of L. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mot.") 1, ECF No. 56.)

8

II.   STANDARD OF REVIEW

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

9

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

III.   DISCUSSION

In light of plaintiff's concession of certain claims, the claims that remain in the case are plaintiff's Fourth Amendment false arrest claim, her Fourth Amendment excessive force claim, her First Amendment retaliation claim, and her state-law claims. For the reasons set forth below, defendants' motion for summary judgment is GRANTED as to each of these claims.

A.   Plaintiff's Fourth Amendment False Arrest Claim

There is no triable issue of fact as to whether the officers had probable cause to arrest plaintiff—they did. Probable cause here is based on the uncontested facts regarding the information that the officers knew at the time that they arrived at the

location and plaintiff's refusal to disperse.  Accordingly, dismissal of plaintiff's false-arrest claim is proper.

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); see also Singer v. Fulton Cnty. Sherriff, 63 F.3d 110, 118 (2d Cir. 1995).  Moreover, a "Fourth Amendment claim turns on whether probable cause existed to arrest for any crime. . . .  Defendants prevail if there was probable cause to arrest Plaintiffs for any single offense." Marcavage v. City of New York, 689 F.3d 98, 109–10 (2d Cir. 2012) (emphasis added).

"Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Singer, 63 F.3d at 119 (internal quotation marks omitted).  A "law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth. . . . The veracity of citizen complaints who are the victims of the very crime they report to the police is assumed." Miloslavsky v. AES Eng'g Soc'y, Inc., 808 F. Supp. 351, 355 (S.D.N.Y. 1992) (citing Adams v. Williams, 407 U.S. 143, 146 (1972)), aff'd, 993 F.2d 1534 (2d Cir. 1993).

Based on the officers' knowledge at the time of their arrival and the events that occurred after their arrival, probable cause existed to arrest plaintiff for disorderly conduct.  "A person is guilty of disorderly conduct when, with intent to

cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: . . . 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse . . . ." N.Y. Penal L. § 240.20 (McKinney). The officers knew that Torres had called 911 because a group of people had been banging on the Starbucks door. (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) Torres had informed the 911 dispatcher that people were "knocking on the door really really bad" and "making nasty comments." (Defs.' 56.1 ¶¶ 20–22; Pl.'s 56.1 ¶¶ 20–22.) Plaintiff was still standing outside the Starbucks when the officers arrived; she asked the officers where she could use a bathroom, and they directed her to leave the area and "go home." (Defs.' 56.1 ¶¶ 45, 46; Pl.'s 56.1 ¶¶ 45, 46; Lucas Decl. Ex. B, at 32:12–19, 34:17–20, Ex. F, at 43:8–13.) However, plaintiff decided to wait for Starbucks to open rather than leave the area, and she told the officers that she could not go home; she also stated in a later online chat that she "refused to move" from the Starbucks. (Defs.' 56.1 ¶¶ 47, 52; Pl.'s 56.1 ¶¶ 47, 52; Lucas Decl. Ex. F, at 43:17–22; Lucas Supp. Decl. Ex. 1.)

These facts were sufficient to form probable cause to arrest plaintiff for disorderly conduct for "congregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse." See N.Y. Penal L. § 240.20(6). A "person is guilty of committing disorderly conduct if he refuses to obey an officer's order to move, unless the order was purely arbitrary and not calculated in any way to promote the public order." Crenshaw v. City of Mount Vernon, 372 F. App'x 202, 206 (2d Cir. 2010) (internal quotation marks omitted).

Here, given the officers' prior knowledge that people had been banging on the doors refusing to leave, their instruction to plaintiff to go home was "lawful," N.Y. Penal L. § 240.20(6), and not "arbitrary," Crenshaw, 372 F. App'x at 206.

The parties' dispute over whether the officers spoke with Torres before they arrested plaintiff (see Defs.' 56.1 ¶¶ 36–40, 42; Pl.'s 56.1 ¶¶ 36–40, 42; Pl.'s Opp. 13–14) is irrelevant to the outcome of this motion. The officers had sufficient information to form probable cause from the 911 radio dispatcher, who undisputedly told the officers that Torres had called 911 from the Starbucks due to "six people banging on the doors refusing to leave." (Defs.' 56.1 ¶¶ 20, 29; Pl.'s 56.1 ¶¶ 20, 29.)

Based on the information known to the officers, probable cause also existed to arrest plaintiff for harassment. "Under New York law, '[a] person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person . . . [h]e or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose." Jaegly v. Couch, 439 F.3d 149, 152–53 (2d Cir. 2006) (alterations in original). The information that the 911 dispatcher communicated to the officers—that a group of people had been banging on a Starbucks door and refusing to leave (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29)—was "reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Singer, 63 F.3d at 119. The fact that the officers did not witness plaintiff knocking on the Starbucks door is immaterial (Pl.'s 56.1 ¶¶ 93, 94; Defs.' Reply 56.1 ¶¶ 93, 94); the officers

received their information from Torres, a "putative victim or eyewitness" whose truthfulness the 911 dispatcher and the officers could assume. See Adams, 407 U.S. at 146; Miloslavsky, 808 F. Supp. at 355.

Finally, probable cause existed to arrest plaintiff for obstruction of governmental administration. "A person is guilty of this offense if he 'prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference . . . .' N.Y. Penal Law § 195.05. Refusing to obey orders to leave the premises can be the basis for an arrest for obstructing governmental administration." C.G. v. City of New York, No. 12-cv-1606 (ARR), 2013 WL 5774291, at *5–6 (E.D.N.Y. Oct. 24, 2013); see also Berger v. Schmitt, 91 F. App'x 189, 191 (2d Cir. 2004) (finding probable cause to arrest a person who refused to leave a scene for obstruction of governmental administration); Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995) (finding probable cause to arrest a person who refused to leave a car for obstructing governmental administration).[8] The officers here lawfully instructed plaintiff to "go home," but she refused to leave. (Defs.' 56.1 ¶¶ 45–47, 52; Pl.'s 56.1 ¶¶ 45–47, 52; Lucas Decl. Ex. B, at 32:12–19, 34:17–20, Ex. F, at 43:8–13, 43:17–22; Lucas Supp. Decl. Ex. 1.) Those actions were sufficient for obstruction of governmental administration.

---

[8] Plaintiff argues that "interference" within the meaning of N.Y. Penal L. § 195.05 must be physical interference." People v. Case, 42 N.Y.2d 98 (1977). Nonetheless, courts in the Second Circuit have found that a refusal to leave constitutes sufficient "interference" to rise to the level of obstruction of governmental administration. See, e.g., Berger, 91 F. App'x at 191; Lennon, 66 F.3d at 425; C.G., 2013 WL 5774291, at *6.

For these reasons, the Court grants summary judgment to defendant on plaintiff's Fourth Amendment false arrest claim.

B.   Plaintiff's Fourth Amendment Excessive Force Claim

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 394–95 (1989) (citation and internal quotation marks omitted).  To sustain a claim for excessive force, plaintiff must show that the use of force is "objectively sufficiently serious or harmful enough to be actionable." United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999).

Plaintiff has failed to raise a triable issue on this claim.  In effecting their arrest of plaintiff, the officers took plaintiff to the ground and used pepper spray twice for approximately one second each. (Defs.' 56.1 ¶¶ 57, 69, 75, 77; Pl.'s 56.1 ¶¶ 57, 69, 75, 77.)  Throughout the arrest, the officers continually instructed plaintiff to stop resisting. (Defs.' 56.1 ¶¶ 56, 64–66; Pl.'s 56.1 ¶¶ 56, 64–66.)  Plaintiff asserts that she was not resisting for the majority of the arrest; indeed, witnesses made several statements to that effect. (Pl.'s 56.1 ¶¶ 64, 65, 72; Pl.'s Opp. 19.)  However, plaintiff also admits that she did not voluntarily offer her hands or arms to be handcuffed, and she stated in an online chat that she "resisted arrest." (Defs.' 56.1 ¶ 55; Pl.'s 56.1 ¶ 55; Lucas Supp. Decl. Ex. 1.)  Additionally, having carefully

reviewed the undisputed video evidence in the record (see Lucas Decl. Ex. M), the Court concludes that plaintiff was indeed resisting arrest; no reasonable juror could infer otherwise.  Viewing the evidence in the light most favorable to plaintiff—as the Court must on summary judgment—does not require disregarding facts and the incontrovertible record.  See Scott, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Zellner, 494 F.3d at 371.

In light of these undisputed facts, the officers did not use excessive force, notwithstanding the fact that the officers arrested plaintiff for a violation rather than a crime.  Balancing "the nature and quality of the intrusion on [plaintiff's] Fourth Amendment interests" (bringing plaintiff to the ground and using pepper spray twice, each time for approximately one second, after having repeatedly warned plaintiff) "against the countervailing governmental interests at stake" (the officers' attempt to arrest a plaintiff who was resisting) leads to the conclusion that the officers' use of force was reasonable.  See Graham, 490 U.S. at 394–95; see also Crowell v. Kirkpatrick, 400 F. App'x 592, 595 (2d Cir. 2010) (finding that the use of tasers on arrestees who were resisting arrest was not excessive force); Tracy v. Freshwater, 623 F.3d 90, 97 (2d Cir. 2010) (finding that a police officer did not use excessive force in striking an arrestee with a metal flashlight, jumping on him, spraying him with pepper spray after he had been placed in handcuffs, and forcibly moving him from the ground to the police car).  Because plaintiff was resisting

16

arrest and attempting to evade the officers' attempts to handcuff her, taking her to the ground and deploying pepper spray were reasonable under the circumstances.[9]

For these reasons, the Court grants summary judgment to defendant on plaintiff's Fourth Amendment excessive force claim.

C.     Plaintiff's First Amendment Retaliation Claim

To avoid summary judgment on her claim for First Amendment retaliation, plaintiff must raise a triable issue with regard to the following: "(1) [she] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by [her] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [her] First Amendment right." Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001). The undisputed facts require dismissal of plaintiff's First Amendment claim for several reasons.

As an initial matter, probable cause is a complete defense to plaintiff's claim of First Amendment retaliation. See Fabrikant v. French, 691 F.3d 193, 216–17 (2d Cir. 2012) (finding that the plaintiff's "claim[] of . . . First Amendment retaliation fail[s] because defendants had probable cause" to arrest and prosecute). For the reasons set forth above, the undisputed facts show that the officers had probable cause to arrest plaintiff for, inter alia, disorderly conduct.

Additionally, even assuming that plaintiff had an "interest protected by the First Amendment," the officers' actions were not "motivated or substantially caused

---

[9] The Second Circuit found that material issues of fact remained in dispute with regard to an officer's use of pepper spray in Tracy, 623 F.3d 90. However, that case is distinguishable, because the arrestee was "already in handcuffs and offering no further active resistance." Id. at 98. Here, by contrast, the undisputed facts and video evidence reflect that plaintiff was indeed actively resisting.

by [her] exercise of that right." <u>Curley</u>, 268 F.3d at 73. The events leading to her arrest occurred when she and Sagan went to find a bathroom; the only speech in which plaintiff engaged in the presence of the officers present was related to her search for a bathroom, her refusal to leave the area, and her subsequent arrest. (Defs.' 56.1 ¶¶ 8, 11, 12, 14, 45, 46, 52, 71; Pl.'s 56.1 ¶¶ 8, 11, 12, 14, 45, 46, 52, 71.) Plaintiff argues that her criticism of the officers' actions constituted protected speech. (<u>See</u> Pl.'s 56.1 ¶¶ 45, 46, 52, 88.) It is true that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." <u>City of Houston v. Hill</u>, 482 U.S. 451, 461 (1987). Additionally, plaintiff argues that her participation in Occupy protest activity prior to the officers' arrival constituted protected speech.

However, plaintiff proffers no evidence that "defendants' actions were motivated or substantially caused by [plaintiff's] exercise of [her First Amendment] right." <u>Curley</u>, 268 F.3d at 73. "Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." <u>Id.</u> The undisputed here facts show that plaintiff was arrested when she refused to disperse. Plaintiff argues that there is a "close temporal proximity between [plaintiff's activity protesting the eviction of Occupy demonstrators] and Defendants' adverse actions against" her. <u>Webster v. City of New York</u>, 333 F. Supp. 2d 184, 202 (S.D.N.Y. 2004). Plaintiff also asserts that it would have been clear to the officers that plaintiff was affiliated with Occupy due to several comments that the officers and Torres allegedly made. (Pl.'s Opp. 21–22.)

This is more argument and speculation.  Defendant Plevritis testified that he did not believe that the people outside the Starbucks were part of Occupy.  (Defs.' 56.1 ¶ 81.)  Plaintiff disputes Plevritis's credibility based on the circumstances and based on several comments that the officers and Torres made (Pl.'s 56.1 ¶ 81), but she proffers no specific evidence that her participation in Occupy factored into defendants' decision to arrest her—only argument to that effect.  Summary judgment is therefore proper.  See Hicks, 593 F.3d at 166 ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.").

Accordingly, the Court grants summary judgment to defendant on plaintiff's First Amendment retaliation claim.

D.   Qualified Immunity

"The doctrine of qualified immunity shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights."  Bradway v. Gonzales, 26 F.3d 313, 317–18 (2d Cir. 1994) (citation and internal quotation marks omitted).  "An arresting officer is entitled to qualified immunity . . . on a claim for arrest without probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree

on whether the probable cause test was met." Golino v. City of New Haven, 950

F.2d 864, 870 (2d Cir. 1991); see also Lennon v. Miller, 66 F.3d 416, 420–21 (2d Cir.

1995) ("An officer's actions are objectively unreasonable when no officer of

reasonable competence could have made the same choice in similar

circumstances.").

Because "it was objectively reasonable for the officer to believe that probable

cause existed," defendants are entitled to qualified immunity here, even if probable

cause did not actually exist. Golino, 950 F.2d at 870. The officers knew, via the 911

dispatcher, that Torres had called 911 because a group of people had been banging

on the Starbucks door. (Defs.' 56.1 ¶ 29; Pl.'s 56.1 ¶ 29.) Moreover, the officers

directed plaintiff to leave the area and go home, but plaintiff decided not to leave

the area, and told the officers that she could not go home. (Defs.' 56.1 ¶¶ 45, 46, 51,

52; Pl.'s 56.1 ¶¶ 45, 46, 51, 52.) Thus, it was "objectively reasonable for the officer[s]

to believe that probable cause existed" to arrest plaintiff for disorderly conduct,

harassment, or obstruction of governmental administration based on the standards

set forth above. Golino, 950 F.2d at 870.

Qualified immunity insulates defendants from liability on plaintiffs' First

and Fourth Amendment claims. Therefore, those claims must be dismissed.

E.     Plaintiff's State-Law Claims

"The district courts may decline to exercise supplemental jurisdiction over a

[state-law] claim if . . . the district court has dismissed all claims over which it has

original jurisdiction." 28 U.S.C. § 1367. Thus, dismissal of plaintiffs state-law

claims is proper in light of the Court's grant of summary judgment on all of

plaintiff's federal claims. See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); Valencia v. Lee, 316 F.3d 299, 304–05 (2d Cir. 2003) ("[T]he district court's retention of jurisdiction over the state-law claims was an abuse of discretion.").

F.    The Officers' Alleged Perjury

Among her arguments, plaintiff asserts that the defendant officers have perjured themselves in the underlying criminal court documents as well as in the course of the litigation. (Pl.'s Opp. 9–12.) Plaintiff argues that the officers' alleged lack of credibility requires denial of summary judgment. In particular, Naimoli alleged in the criminal complaint against plaintiff that he personally observed her banging on the door of the Starbucks; however, he admitted in his deposition that this was not true. (Pl.'s 56.1 ¶ 103; Defs.' Reply 56.1 ¶ 103.) Naimoli also allegedly perjured himself by telling ADA Lynch that he was "informed" that plaintiff was banging on the Starbucks door. (Pl.'s 56.1 ¶ 106.)

Even if true, plaintiff's assertions about the officers' alleged perjury are irrelevant to the outcome of this motion. As set forth above, the officers had probable cause to arrest plaintiff for disorderly conduct given their knowledge that Torres had called 911 for people knocking on the door and refusing to leave, and given plaintiff's refusal to leave the Starbucks. See N.Y. Penal L. § 240.20(6); Crenshaw, 372 F. App'x at 206. Because the officers had probable cause to arrest

plaintiff, defendants are entitled to summary judgment regardless of the events

surrounding the criminal complaint. See Marcavage, 689 F.3d at 109–10

("Defendants prevail if there was probable cause to arrest Plaintiffs for any single

offense.") (emphasis added).

IV.    CONCLUSION

  For the reasons set forth above, defendants' motion is GRANTED. The Clerk

of Court shall terminate this action.

  SO ORDERED.

Dated:  New York, New York
     June 18, 2014

             K B. Forr

            KATHERINE B. FORREST
           United States District Judge

USDC SDNY

DOCUMENT

ELECTRONICALLY FILED 06/18/2014

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
Imani Brown,

                        Plaintiff,                                **13 CIVIL** 1018 (KBF)

         -against-                                      **JUDGMENT**

City of New York, et al.,

                        Defendants.
-----------------------------------------------------------X

       Defendants City of New York and police officers Justin Naimoli and Theodore Plevritis

having moved for summary judgment (Doc. #34) pursuant to Fed. R. Civ. P. 56, and the matter

having come before the Honorable Katherine B. Forrest, United States District Judge, and the Court,

on June 18, 2014, having rendered its Opinion & Order (Doc. #64) granting Defendants' motion for

summary judgment and directing the Clerk of Court to terminate the action, it is,

       **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Opinion & Order dated June 18, 2014, Defendants' motion for summary judgment is

granted; accordingly, the case is closed.

**Dated:** New York, New York
       June 18, 2014

                                        **RUBY J. KRAJICK**

                                        **Clerk of Court**

                 **BY:**        K. Mango

                                        **Deputy Clerk**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
IMANI BROWN,

                              Plaintiff,

          -against-                                    **NOTICE OF APPEAL**

THE CITY OF NEW YORK, a municipal entity;              No. 13-cv-1018 (KBF)
and New York City Police Officers JUSTIN
NAIMOLI (Shield #26063) and THEODORE
PLEVRITIS, in their individual capacities,

                              Defendants.
------------------------------------------------------------------- X

      NOTICE IS HEREBY GIVEN that Plaintiff Imani Brown hereby appeals to the United

States Court of Appeals for the Second Circuit from the Judgment and Opinion and Order of

Honorable Katherine B. Forrest granting summary judgment for the Defendants, and from each

and every part thereof, entered June 18, 2014.


Dated: New York, NY
      July 11, 2014

                                        Respectfully submitted,


                                        Joshua S. Moskovitz (JM3635)
                                        BELDOCK LEVINE & HOFFMAN LLP
                                        99 Park Avenue, Suite 1600
                                        New York, NY 10016
                                        (212) 490-0400
                                        Fax: (212) 557-0565
                                        jmoskovitz@blhny.com